[No. 15892.    Department Two.    January 19, 1921.]

HITT FIREWORKS COMPANY, *Appellant*, v.
SCANDINAVIAN AMERICAN BANK,
*Respondent*.[1]

BANKS AND BANKING (26)—GENERAL OR SPECIAL DEPOSITS—EVIDENCE AS TO PURPOSE—SUFFICIENCY. There was a special and not a general deposit, rendering the bank liable as a trustee and preventing the bank from charging the account, where plaintiff, a fireworks company, had a lien on gate receipts received at evening performances given by an exposition company, between whom it was agreed and understood that the money was to be held in a separate fund to be applied on the contract of plaintiff, who was offered the money late at night, and who, owing to the lateness of the hour, accepted a check instead on the assurance that the check would be good, made by the treasurer of the exposition, who was also the cashier of the bank, and the money was placed by him, or others by his direction, on the floor of the vault, where it remained over the holidays.

Appeal from a judgment of the superior court for Pierce county, Chapman, J., entered February 5, 1920, dismissing an action to recover a special deposit, after a trial on the merits to the court.   Reversed.

*Ellis & Evans*, for appellant.

*Williamson, Williamson & Freeman* (*T. L. Stiles*, of counsel), for respondent.

MAIN, J.—This is an action brought by the Hitt Fireworks Company, as plaintiff, against the Scandinavian American Bank of Tacoma, for damages. After the issues were framed, the cause in due time came on

[1]Reported in 195 Pac. 13; 196 Pac. 629.

for trial before the court sitting without a jury. At the conclusion of the plaintiff's evidence, a motion was made by the defendant to dismiss the action because it was claimed that a case had not been made out. This motion was sustained and a judgment of dismissal entered. The plaintiff appeals. The facts may be summarized as follows:

The Hitt Fireworks Company is a corporation organized and existing under the laws of the state of Washington. The Scandinavian American Bank is a corporation organized under the laws of this state and is conducting a banking business in the city of Tacoma. The Northwest Peace Jubilee Company was a corporation organized for the purpose of putting on a jubilee celebration in the city of Tacoma from June 30 to July 6, 1919. The jubilee grounds included the Tacoma Stadium and certain grounds adjacent thereto. On June 20, 1919, the Peace Jubilee Company entered into a written contract with the Hitt Fireworks Company whereby the latter was to furnish a special fireworks display which was to be in the Stadium. This contract, among other things, provided that there should be paid to the Hitt Fireworks Company, out of the first proceeds by the Jubilee Company from the sources of revenue to the exclusion of all other obligations, the amount which was due the fireworks company.

On July 2, the fireworks company had not put on any part of its program. The president of the company, not being satisfied with the contract, refused to proceed until he was given further assurance that the money which would be due him under the contract would be paid if the show was put on as contemplated. M. M. Ogden was treasurer of the Peace Jubilee Company and also cashier of the Scandinavian American Bank. On the afternoon of the day mentioned, the executive committee of the Peace Jubilee Company

had a meeting at which Mr. Ogden and others were present, and entered into negotiations with the president of the Hitt Fireworks Company looking to the adjustment of the question which had arisen. The result was that a resolution was passed which provided:

"The Hitt Fireworks Company will have a lien on all moneys received at the gate which goes directly into the Stadium from the street, and a further lien of twenty-five cents per capita for all persons passing from the Jubilee grounds into the Stadium on the nights of July 2nd, 3rd and 4th; it was also understood by all parties that the Northwest Peace Jubilee . . ."

The resolution further recited:

"It was understood that Mr. Hitt would be allowed to check the receipts from the gates leading direct into the Stadium as well as the number of tickets representing the people passing from the Jubilee grounds into the Stadium and that amount received at the gate leading from the street direct into the Stadium plus twenty-five cents per capita for every person passing from the Jubilee grounds into the Stadium shall be held in a separate fund by the treasurer, M. M. Ogden, to be applied on the total amount of the contract between the Northwest Peace Jubilee and Hitt Fireworks Company."

Mr. Hitt was the president of the Hitt Fireworks Company. After this resolution was passed and on the evening of July 2, the fireworks company put on its performance in the Stadium; likewise, on the third and fourth. On the evening of the third, at about twelve o'clock, after the show was over, the president of the fireworks company went to the office of Mr. Ogden, treasurer of the Peace Jubilee Company, and the receipts were there assembled on a desk or table. At this meeting Mr. Ogden said to Mr. Hitt, in effect,

"Here's your money, how will you have it?" To which Mr. Hitt replied, "It is very late for me to take that amount of money in my personal supervision at this time of night," and a check was tendered, which Mr. Hitt testified he accepted provided it was good, and he was assured by Mr. Ogden that the check would be good when presented. The testimony of Mr. Hitt as to what occurred on the night of the third is as follows:

"A. On the night of the 3rd I went into the treasurer's office, Mr. Ogden was there, and the money or the receipts were laying there on the desk and the crowd was double the night of the 2nd, we were both feeling pretty good. He said, 'Here is your money, how will you have it?' I said, 'It is very late for me to take that sum of money in my personal supervision, at that time of night,' and he tendered me a check. I said I would accept the check provided it was good. That is substantially, your Honor, the conversation that took place on the night of the 3rd.

"Q. Did he say whether the check would be good in that conversation—the night of the 3rd is what I am asking about? A. Yes, he said it would be good, it was good. Q. After that you accepted these two checks? A. I did. Q. He had the money there, the cash? A. He did. Q. To refresh your memory was anything said in that conversation about banking the money at all? A. He stated that the check would be good or that the check was good, and some further conversation was made about taking the money to the bank, and relying on the statement or rather the committee meeting that had been had, I took his word for the fact that the money would be good, that the checks would be good when presented."

The account of the Peace Jubilee Company was kept in the Scandinavian American Bank, of which Mr. Ogden was cashier. On the night of the third, two checks were given for three thousand dollars each; the money was taken by Mr. Ogden and placed upon the floor of the vault in the bank. On the night of July

4, substantially the same thing occurred. Mr. Hitt went to the office of Mr. Ogden, the treasurer of the Peace Jubilee Company, and at that time it was thought that the receipts had been abundant to take care of all expenses, since the attendance had been large. The money for that performance was there and as testified by Mr. Hitt:

"The same proposition occurred—it was impossible for me to take the funds or inadvisable for me to take funds in actual cash, so they offered me a check which I accepted."

On this night, a check was given Mr. Hitt for the fireworks company for $8,100. The money was taken by Mr. Ogden and placed on the floor of the vault in the bank. On the morning of the fifth, Mr. Hitt went to the bank for the purpose of getting his checks cashed and was advised that, that being a holiday, they could not be then paid; this was on Saturday the fifth. On Sunday, the sixth, a number of persons interested in the show had a meeting at which was present the attorney for the bank and Mr. Ogden. At this time it was decided to have one of the creditors garnishee the bank. On the morning of the seventh, which was Monday morning, Mr. Ogden caused the money which had been placed upon the floor of the vault to be entered upon the books of the bank in the general account of the Peace Jubilee Company. The Jubilee Company had an overdraft at the bank of something like eleven thousand dollars, which then was charged against the account. Mr. Hitt presented his checks, the two three thousand dollar checks being paid and the payment of the eight thousand dollar check refused because there were not sufficient funds to cover it. Thereafter, this action was brought against the bank, claiming that, as against the Hitt Fireworks Company, the bank had no right to charge off the over-

draft of the Peace Jubilee Company against its account.

The first question to be determined is whether the deposit in the bank made on Monday morning was a special or a general deposit. The general rule is that, when money is deposited, title passes to the bank and it becomes the debtor of the depositor to the extent of the deposit. But this rule is subject to exceptions, one of which is that where money is deposited to be used for a particularly designated purpose, the deposit is special and title does not pass to the bank. *Kies v. Wilkinson,* 101 Wash. 340, 172 Pac. 351. When the deposit is special, the bank becomes a trustee and holds the money in a fiduciary capacity. *Carlson v. Kies,* 75 Wash. 171, 134 Pac. 808, 47 L. R. A. (N. S.) 317. If the deposit was special and not general, the bank, in the present case, had no right to charge the account of the Peace Jubilee Company with the overdraft and thus defeat the claim of the fireworks company. *Dolph v. Cross,* 153 Iowa 289, 133 N. W. 669. Whether the deposit was special or general depends upon the understanding of the parties at the time it was made. If it was deposited for the particular purpose of paying the checks which had been drawn by the Peace Jubilee Company in favor of the Hitt Fireworks Company, it was a special deposit. *Stephens v. Chehalis Nat. Bank,* 80 Wash. 254, 141 Pac. 340.

Looking, then, to the question as to whether the deposit was special, it appears that, under the original contract as modified by the resolution referred to, the Hitt Fireworks Company had a lien on all the moneys received at the gate which went into the Stadium, and a further lien of twenty-five cents per capita for all persons passing from the Jubilee grounds into the Stadium, and that it was agreed and understood that this money was to "be held in a separate fund by the

treasurer, M. M. Ogden,'' to be applied on the total amount of the contract between the Northwest Peace Jubilee and the Hitt Fireworks Company. On the night of the third of July, and the fourth, when the parties met, the money was on the table or desk, and Mr. Hitt of the fireworks company was told that it was there and it was his money. He preferred not to take it, not desiring to handle that sum of money at that time of night. Checks were given and the money taken by Mr. Ogden and placed on the floor of the vault in the bank. At the time the checks were given, there was assurance by Mr. Ogden that they were good and in effect would be paid. The only reasonable inference to be drawn from the evidence is that the checks were to be paid out of the money then on the table which was to be deposited in the bank. This being true, the deposit when made was a special deposit. The bank, therefore, had no right to charge the account of the Peace Jubilee Company with this overdraft to the prejudice of the Hitt Fireworks Company.

The next question which arises is whether the bank had notice that the deposit was special and not general. It is argued that, since the money came into the possession of Mr. Ogden as treasurer of the Peace Jubilee Company, knowledge in that capacity of the special nature of the deposit would not be imputed to the bank. It is true that, when the money first went into Mr. Ogden's possession, it was received by him as treasurer of the Jubilee Company. In the capacity of treasurer of that company, he drew the checks. Sometime subsequent to his doing this and his placing of the money on the floor of the vault in the bank, he ceased to hold the money as treasurer of the Peace Jubilee Company, and held it as cashier of the bank. It could not be said that, as treasurer of the Jubilee Company, he would have the right to open the doors of

the bank at twelve o'clock at night, open the doors of the vault and place the money on the floor thereof. At least from the time the money entered the bank, it was held by Mr. Ogden as cashier of the bank and thus continued until on the morning of the seventh, when it was entered on the books of the bank.

There can be no question that, under these circumstances, the knowledge of the bank's cashier was knowledge to the bank. From the time he received the money until it was placed upon the floor of the vault in the bank, the transaction was immediate and continuous and the thing that he held as treasurer of the Jubilee Company was the same subject-matter which he held as cashier of the bank. The law imputes to the principal and charges him with all notice or knowledge relating to the subject-matter of the agency which the agent acquires or obtains while acting as such agent and within the scope of his authority, or which he may previously have acquired and which he then had in mind, or which he had acquired so recently as to reasonably warrant the assumption that he still retained it. *Gaskill v. Northern Assurance Co.*, 73 Wash. 668, 132 Pac. 643. Applying the rule to the facts in the present case, Ogden had in mind the special nature of the deposit to be made when the money was entrusted to him and checks drawn and delivered, or he had acquired this knowledge so recently as to reasonably warrant the assumption that it was present in his mind when he ceased to hold the money as treasurer and began holding it as cashier.

In *Goshorn v. People's Nat. Bank,* 32 Ind. App. 428, 69 N. E. 185, 102 Am. St. 248, a depositor, desiring to withdraw his deposit and commit it to a trust company, received from the bank cashier a suggestion as to a particular trust company and drawing a check delivered it to the cashier with instructions to deposit the

amount named with the company suggested. Instead of doing so, the cashier substituted the depositor's money for paid checks of his own on the bank which he was carrying as cash. It was there held that, even on the theory that the cashier was the depositor's agent for the transmission of the fund, the bank was liable for its misappropriation, the transaction amounting to the payment of the depositor's check merely with the evidences of the cashier's indebtedness and the bank was charged with knowledge of the fraudulent transaction through its cashier.

In *Smith v. Anderson*, 10 N. Y. Supp. 278, the plaintiff delivered moneys to the president of a bank to be deposited therein, and the latter, without plaintiff's knowledge or consent, deposited them in his own name as her attorney and afterwards unlawfully appropriated a large part to his own use. It was held that the bank was liable, since it was chargeable with the knowledge possessed by its president. That case was cited with approval in *Orme v. Baker*, 74 Ohio St. 337, 78 N. E. 439, 113 Am. St. 968. Knowledge of the cashier, even though acquired away from the bank, may be imputed to the bank. *Houghton v. First Nat. Bank*, 26 Wis. 663, 7 Am. Rep. 107.

The case of the *Washington Nat. Bank v. Pierce*, 6 Wash. 491, 33 Pac. 972, 36 Am. St. 174, is distinguishable. There the communication to the president of the bank was made not only while he was away from the bank and engaged in another transaction, but was made without reference to the bank's business and was only a casual remark while the parties were engaged upon other matters. Here the transaction of delivering the checks and depositing the money was deliberate and specific, the subject of the conversation being then in the custody of the treasurer and subsequently in his custody as cashier.

Something has been said about the lien provided for in the contract not working an equitable assignment. Whether this is true, it is not necessary to determine, because subsequently a fund came into existence and the right of the fireworks company to it was recognized and the checks were given only for the purpose of avoiding the necessity of Mr. Hitt's taking into his possession so much money at such a late hour at night. The case of *Huling v. Cabell,* 9 W. Va. 522, 27 Am. Rep. 562, was where assignment only was relied upon. In this case, the facts show not only an assignment, but a recognition of the right to the fund. It has been suggested that Mr. Hitt, by accepting the checks, waived his right to rely upon a special deposit, but under the facts in this case this position is not meritorious.

Whether the bank, the respondent, would be liable on the theory of estoppel by reason of the fact that its cashier represented that the checks were good and would be paid, it is not necessary here to determine.

The judgment will be reversed and the cause remanded with directions to the superior court to grant a new trial.

MOUNT, MITCHELL, HOLCOMB, and TOLMAN, JJ., concur.

## ON REHEARING.

[Department Two.   March 31, 1921.]

PER CURIAM.—In the petition for rehearing on this case, issue was taken with a statement in the opinion to the effect that the money was taken to the bank by Mr. Ogden and placed upon the floor of the vaults therein. In legal effect, assuming that the statement in the opinion is incorrect, the result would be the same. It can make no difference whether Mr. Ogden himself took the money to the bank and caused it to be placed upon

the floor of the vault or whether he directed that it be thus disposed of by others. In the testimony referring to this matter, Mr. Ogden in one place states:

"The receipts of the various nights were taken down to the bank that evening by several of us to be placed on the floor of the vaults, and Mr. Morse coming down the next morning and having the entries made on his pass book."

Mr. Morse was cashier of the Peace Jubilee Company. As stated in the opinion, on the nights of July 2, 3 and 4, when the conversation took place relative to the disposition of the money and the drawing of the checks, Mr. Ogden was present. The money was on the table. It was, at least constructively, in his possession as treasurer of the company and was subject to his direction.

The petition for rehearing will be denied.