[No. 26660.   *En Banc.*   July 22, 1938.]

ASSOCIATED INDEMNITY CORPORATION, *Respondent,* v.
A. DEL GUZZO *et al., Defendants,* THE NATIONAL
BANK OF COMMERCE OF SEATTLE, *Appellant.*[1]

[1]Reported in 81 P. (2d) 516.

*Kerr, McCord & Carey* and *W. H. Abel,* for appellant.

*Grinstead, Laube & Laughlin, Arthur Grunbaum, Patrick A. Geraghty,* and *R. V. Welts,* for respondent.

BEALS, J.—The plaintiff, Associated Indemnity Corporation, a corporation, sued A. Del Guzzo, The National Bank of Commerce of Seattle, a corporation (hereinafter referred to as the bank or as appellant), Edward Nepple, and many other defendants, for the purpose of establishing plaintiff's liability as surety on a statutory contractor's bond, whereby plaintiff, under date April 12, 1934, underwrote the performance of Del Guzzo, who had contracted with Skagit county to construct a secondary highway. The defendants other than the three above named were urging claims against the job, but prior to the trial of this action, all claims

except that of defendant bank were settled or abandoned.

By the pleadings as finally at issue, plaintiff sued the bank, Del Guzzo, and Edward Nepple, alleging that the bank, with Del Guzzo and Nepple, plaintiff's own agent, had fraudulently misled plaintiff into executing Del Guzzo's bond, whereby plaintiff had been damaged in a large sum, for which, together with expenses, plaintiff demanded judgment. Defendant Del Guzzo answered, praying for judgment against Skagit county and the state of Washington for the balance due under the contract; while the bank, by way of a cross-complaint, demanded judgment against plaintiff for over twenty-eight thousand dollars, on account of claims against the job for labor, material, and supplies furnished therefor, which claims the bank owned by assignment. Plaintiff denied that the claims owned by defendant bank were lienable, and asked for judgment as above stated.

Upon the somewhat complicated pleadings, the issues having been made up, the action was tried to the court and resulted in a decree in plaintiff's favor, the court having found that the bank, Del Guzzo, and Nepple had fraudulently conspired to cause plaintiff to execute Del Guzzo's bond; that plaintiff had suffered damage thereby and was entitled to relief against the defendants. The decree dismissed the bank's cross-complaint with prejudice, awarded to plaintiff the sum of $13,678.83, being a portion of the retained percentage and pre-final estimate under the contract deposited in the registry of the court by Skagit county as admittedly due for work performed under the contract, and further awarded plaintiff judgment against the bank, Del Guzzo, and Nepple, jointly and severally, in the sum of $17,042.35. From this decree, defendant bank has appealed.

Appellant assigns error upon the entry of judgment against it in favor of respondent, contending that respondent was not entitled to judgment against appellant in any sum whatsoever, also contending that the trial court erred in awarding to respondent the $13,-678.83, or any portion thereof, which Skagit county had paid into the registry of the court. Appellant also assigns error upon the refusal of the trial court to grant judgment in its favor for the sum of $28,128.89, or such lesser sum as the evidence warranted, against the respondent and defendant A. Del Guzzo, and against each of them.

The following is a brief statement of the facts as disclosed by the record: Defendant A. Del Guzzo had for several years been building roads, laying water mains, etc., under contract with the state or some municipal subdivision thereof. He was a client of the Montesano State Bank, of which W. H. France was manager. Later, appellant, National Bank of Commerce of Seattle, took over the Montesano State Bank, that institution continuing to function, under Mr. France's management, as the Montesano branch of appellant. Appellant acquired this litigation as a result of its absorption of the Montesano State Bank. Edward Nepple was local agent of respondent at Montesano, representing respondent in that vicinity. R. J. Wilton, a vice-president of respondent, was in charge of its Seattle office up to March 12, 1935, and Charles A. Prevost was in charge of respondent's surety bond business, with headquarters at San Francisco.

Appellant (and by appellant we refer to the Montesano State Bank as well as the consolidated institution) had financed several of Del Guzzo's contracts, including some work which he had done for Mason, Lewis, and Pierce counties, as well as a road contract for the building of what is referred to as the Maryhill road.

Respondent furnished bonds for all or most of these contracts. At the time of the signing of the Maryhill contract, November 8, 1933, Del Guzzo was indebted to appellant in the sum of ten thousand dollars, secured by assignments on the Lewis and Mason county contracts, and was also indebted to the Elma branch of the Montesano State Bank in the sum of five thousand dollars. Appellant financed Del Guzzo under the Maryhill contract, but instead of taking security by way of assigned estimates as the work progressed, itself paid the laborers and materialmen, taking from them assignments of their claims against the job, guaranteed by Del Guzzo. It appears that some of the bills paid by the bank were for equipment and other matters which probably did not constitute claims for which respondent, as Del Guzzo's surety, was responsible. As Del Guzzo received warrants on account of the work, he deposited them with appellant to his own credit, and drew his checks against them. In this manner, he liquidated his prior indebtedness of fifteen thousand dollars to the bank and its Elma branch. The work under the Maryhill contract was in due time completed, and was accepted by the state March 30, 1934. Del Guzzo was then indebted to the bank upon his guaranty agreement, or notes, in the sum of approximately fifteen thousand dollars. There was still some money due him from Lewis and Mason counties, and some also on account of the Maryhill contract.

Respondent's agent, Edward Nepple, was naturally interested in assisting Del Guzzo and other contractors in procuring contracts which would require bonds. It appears that he and Del Guzzo had become quite friendly, the latter having been assisted by Nepple in various ways.

During the month of March, 1934, Skagit county advertised for bids for the construction of a road known

as the Deception Pass secondary highway. Del Guzzo was then finishing the Maryhill job, and Nepple wrote to Skagit county for a copy of the plans and specifications covering the advertised work, which evidently were turned over to Del Guzzo, who went to Skagit county and looked over the ground, later submitting a bid. Realizing that, if Del Guzzo's bid should be accepted, he would have to file a bond in a considerable amount, Nepple, on March 28, 1934, prepared for Del Guzzo, in part at least from information received from him, a financial statement, which Del Guzzo signed.

This statement, sworn to March 28th, was dated as of March 19th, and Nepple telephoned France, asking the amount of Del Guzzo's bank balance on that day. France stated he would not give the information until requested so to do by Del Guzzo, whereupon the latter himself made the request, and France wrote to Nepple a letter which is in the record before us. In this letter, it is stated that Del Guzzo's balance, March 19, 1934, amounted to $882.65. The letter contained no reference to the fact that Del Guzzo was at this time indebted to the bank in the sum of nearly fifteen thousand dollars, on his agreement guaranteeing payment of the claims for labor and material and other items, which claims had been purchased by the bank.

Nepple promptly forwarded to respondent's Seattle office France's letter and the financial statement signed by Del Guzzo, together with a so-called report signed by himself. He also wrote another letter to Mr. Wilton, painting a highly colored picture of Del Guzzo's past performances and his expectations if he should procure the Skagit contract. The papers were forwarded from Seattle to respondent's San Francisco office, and the application for a bond was accepted. Accordingly, the bond was executed by respondent's Seattle agent and delivered to Del Guzzo April 12th. Del Guzzo

was the successful bidder for the Skagit job and received the contract therefor, filing the bond which respondent had executed for him April 16, 1934.

It appears that, April 21, 1934, France, Nepple, Del Guzzo, and W. H. Abel, the bank's attorney, met at the latter's office in Montesano. The time for filing claims against the Maryhill job would expire April 29th. Mr. Abel testified that he believed that the claims which had been assigned by Del Guzzo to the bank were valid claims against the Maryhill bond, which respondent had written. Certainly, many of them were of that class. He also testified that both Del Guzzo and Nepple did not want the claims filed, and that it was finally agreed that Nepple, as agent of respondent, should execute on respondent's behalf an agreement or bond guaranteeing payment, within six months, of the claims against the Maryhill job which had been assigned to the bank.

Nepple testified that, before signing the agreement, he talked to Mr. Wilton, his principal, over the telephone, and was by the latter authorized to execute the agreement, and that he later gave Mr. Wilton a copy thereof. Mr. Nepple's testimony was corroborated to some extent by that of his secretary. Mr. Wilton denied that he knew anything of any such undertaking by Nepple on behalf of respondent, and from the evidence we are decidedly of the opinion that, as matter of fact, Mr. Wilton was never advised by Nepple of the execution of the instrument.

April 21, 1934, Del Guzzo deposited with appellant bank a little over five thousand dollars, being the final payment received by him on the Maryhill contract. Within a few days thereafter, appellant placed to Del Guzzo's credit a loan in the amount of six thousand dollars. Some of this money was by Del Guzzo transferred to his credit with Pacific National Bank of Se-

attle. Out of these moneys, Del Guzzo paid outstanding bills which had been incurred in the performance of the Mason, Lewis, and Pierce county contracts, also the Maryhill job, and eight hundred dollars expense in connection with the Skagit contract. Thereafter, appellant financed Del Guzzo under the Skagit contract by paying claims of laborers and materialmen, taking assignments of their claims against the job and the bond, Del Guzzo guaranteeing the claims.

July 13, 1934, appellant received from Pacific National Bank its cashier's check for ten thousand dollars, which appellant applied on Del Guzzo's indebtedness under the Maryhill contract, and August 17th following, appellant received from the Mount Vernon branch of the First National Bank of Seattle its cashier's check for six thousand dollars, which appellant also applied on the Maryhill debts. This money had come to Del Guzzo by way of payments on account of the Skagit job.

Under date March 16, 1934, Del Guzzo had assigned to appellant, as further security for his indebtedness, all sums due him from Lewis and Mason counties and from the state.

The Skagit contract was completed during the autumn of 1934, but soon thereafter Del Guzzo was awarded a supplemental contract for the performance of additional work on a yardage basis. August 29th, Nepple wrote the commissioners, stating that the bond already given should cover the supplemental contract. The total contract price came to something over eighty-seven thousand dollars, and when the job was finally completed, there were outstanding many unpaid bills.

During the month of June, 1934, a bonding company which was proposing to underwrite a portion of the bond executed by respondent on the Skagit contract, sent a questionnaire to the bank at Montesano in con-

nection with Del Guzzo's financial standing, which the bank accomplished, failing, however, to set forth Del Guzzo's indebtedness to the bank.

The trial court entered no formal findings of fact, but filed a lengthy and comprehensive memorandum opinion, which has been certified to us as part of the statement of facts. The trial court called attention to the fact that the evidence disclosed an unusually close business relationship between Del Guzzo, Nepple, and France, representing the bank, and that Nepple had acted for the bank in obtaining assignments of labor claims and picking up and delivering checks. He also acted as intermediary between the bank and Del Guzzo, and the court stated:

"It is not conceivable, in view of the close business relationship between these three parties, that any one of them should be ignorant of the principal transactions and relations involved in this action."

The court also called attention to the fact that, under his power of attorney from respondent, Nepple was not a general agent, and observed that, from matters in the record, it clearly appeared that Nepple knew he was not respondent's general agent and did not consider himself as such. The trial court summarily dismissed the contention urged by appellant, that 'the acts of France were not binding upon the bank. We agree with the trial court in holding that this contention is clearly untenable. The striking difference between Nepple's conduct and that of France is also noted. The latter acted in good faith toward his bank, while Nepple was guilty of bad faith toward respondent, his principal. As the court stated, "The concerted acts of all three defendants tended to advance their own interests and were adverse to the interests of the plaintiff."

Naturally, as observed by the trial court, Del Guzzo

benefited by having his contracts financed. Nepple was interested on his own behalf, and also was endeavoring to protect the bank as against his own principal. The bank, of course, was seeking protection from possible loss because of its financial dealings with Del Guzzo. Quoting again from the memorandum opinion:

"This record shows beyond question that Nepple, with the aid and assistance of Del Guzzo and France, withheld from his principal, the surety company, information which if communicated would have determined the surety company to refuse the bond on the Skagit job. Consider the letter of March 30, 1934, plaintiff's exhibit UUU. Del Guzzo requested Nepple to get from France a financial statement and recommendation to be used in securing the bond. France wrote the letter to Nepple for use of Del Guzzo with Nepple's principal for the purpose of securing the bond. It is misleading and deceptive and concealed or withheld facts which Nepple knew were vital to the interests of his principal and must have so been considered by the other two defendants. There is no persuasion in the argument that the bank was not obliged to disclose the real financial condition of Del Guzzo. The purpose of the inquiry from the surety company was to obtain a true financial statement, and the honest purpose of Del Guzzo and Nepple, at least, should have been to disclose the true facts and all the facts upon which the surety might base its decision as to furnishing the bond.

"At the same time France furnished a financial statement, plaintiff's exhibit ZZZ, to the Central Surety and Insurance Corporation, a reinsurer of the Del Guzzo contract, in which he stated as in the letter that Del Guzzo's balance subject to check was $882.65, but, under subdivision 4, where he is asked to give financial statements disclosing indebtedness to the bank, he leaves the answer blank, implying that there is no such indebtedness.

"The financial statement, plaintiff's exhibit S-4, given by Del Guzzo, dated March 19, 1934, contains the same

item of cash in bank, but no mention of Del Guzzo's indebtedness to the bank as it then existed, amounting to some $15;000.

"There seemed to be a frenzied attempt about this time of the three defendants to convince the surety company that Del Guzzo was an exceptional risk, while at the same time all three parties had within their knowledge facts to the contrary. . . .

"The motive for this is apparent when the testimony of prior transactions of the parties is considered disclosing the financing of Del Guzzo by the bank on his former contracts by purchasing claims and taking Del Guzzo's notes as collateral, presumably under the authority of the Philbrick and Nicholson case, 147 Wash. 277. The fact that as to a number of the claims the question of their liability was uncertain, and the further question of the validity of the assignments even under the Philbrick and Nicholson case, the manner of handling those assignments was very different from that followed in the Philbrick and Nicholson case, and, in my judgment, was not legal.

"It became very important that Del Guzzo get this large job in order to save himself, the bank and Nepple. When the Skagit job was secured and the bond furnished, the meeting of April 21, 1934, at Mr. Abel's office was held, at which time the guaranty bond, defendant's exhibit 27, was executed. By that bond executed by Nepple as attorney-in-fact for plaintiff, and of which the plaintiff had no knowledge, Nepple attempted to bind his principal to pay the bank $15,518.16, being the outstanding indebtedness of Del Guzzo on the Maryhill job. The bank was to refrain from filing liens and asserting its lien rights against the state and the surety, in consideration whereof the surety was to pay the balance within six months.

"This transaction was never called to the attention of the plaintiff. The premium on the bond was never reported by Nepple. The bond was never mentioned by any of the defendants when their depositions were taken, and its existence never disclosed until long after the bringing of this action. Certainly, a transaction of this moment was not within the powers of Nepple, and the concealment of the same was vital to his principal's

interests and stamps the whole with the badge of fraud."

The decree, after recitals of the allegations of the pleadings and the appearance of the parties, continues:

"The court having found that defendants National Bank of Commerce of Seattle, A. Del Guzzo and Edward Nepple had fraudulently conspired to cause plaintiff to execute the bond herein, and that plaintiff was damaged thereby and that the amounts paid by the plaintiff to claimants against it and the said fund were reasonable and just, and that its expenses as proved were reasonable and proper; that plaintiff and defendants have heretofore stipulated that $4,000.00 should be deducted from the amount of any judgment in favor of plaintiff to adjust disputed items in the settlement of claims, and that plaintiff holds a valid assignment from A. Del Guzzo of the pre-final estimate and the retained percentage heretofore deposited in court by Skagit county and that there are no valid and unpaid claims against said bond and retained percentage, and being duly advised in the premises  .  .  ."

and dismisses appellant's cross-complaint with prejudice, awards to respondent the money paid into the registry of the court by Skagit county, save a specified deduction, and grants respondent judgment in addition for the sum of $17,042.35, together with interest and costs.

The statement of facts is voluminous, containing approximately sixteen hundred pages of testimony. Approximately two hundred writings were received in evidence.

Arguing in support of its first assignment of error, appellant contends that it neither made, profited by, nor participated in any fraudulent misrepresentations or concealments of any material fact upon which respondent relied, or by which it was misled; and that, if any agent of appellant made or participated in any such misrepresentation, such act was beyond the scope

of his duties and powers, was beyond the power and authority of the bank, and that appellant is not in law responsible therefor. In this connection, appellant also argues that, if respondent is entitled to any recovery, the trial court did not apply the proper measure, and awarded recovery in too large an amount.

We are convinced, as was the trial court, that, if an agent of appellant bank did make or participate in any wrongful or fraudulent act which misled respondent to its detriment, appellant, under the facts here shown, is responsible therefor. The turning point of the case is whether or not any such act was participated in by any agent of appellant.

It is clear that, as Del Guzzo's work under the Maryhill contract approached its close, the position of the bank as a creditor of Del Guzzo was at least precarious. It was important to Del Guzzo and the bank that the former have an opportunity to recoup his losses and pay the bank what he owed. We are convinced, as was the trial court, that, for some reason, Nepple was willing to go to almost any lengths to assist Del Guzzo, and through him, appellant. Del Guzzo testified that, in preparing the statement dated as of March 19, 1934, he simply forgot to include his indebtedness to the bank, amounting to almost fifteen thousand dollars, consisting of Maryhill claims owned by the bank, and which it contended were lienable items, all of which, of course, he had guaranteed. This lapse of memory was most fortunate for anyone who was interested in inducing respondent to execute a bond for Del Guzzo on the Skagit job.

It clearly appears from the record that appellant, from the very start of the Maryhill project, was concerned about its position as a creditor of Del Guzzo. A striking change in its method of financing the work was put into operation, as testified by France, and the

bank, taking Del Guzzo's notes, purchased the accounts incurred during the progress of the work. Nepple had endorsed some of Del Guzzo's paper to the bank, and its officers, of course, knew this. A complete history of the Maryhill work appears in the record, showing that the bank knew that money which it was receiving from time to time came from the Maryhill contract, and that it was appropriating this money to the payment of old debts which were not claims against that job. This practice was denounced by this court in the early case of *Crane Co. v. Pacific Heat & Power Co.,* 36 Wash. 95, 78 Pac. 460. Nepple had approved purchase by the bank of certain claims against Del Guzzo, and on or soon after March 16th, gave his consent to assignments of retention money on the as yet uncompleted Lewis and Mason county contracts.

At all times after January 1, 1934, Del Guzzo was heavily indebted to the bank, and when his checking account occasionally amounted to a considerable sum, the money was promptly checked out, either to the bank or in payment of accounts for labor and material. France's letter of March 30th to Nepple states that Del Guzzo's "balance with us this year has ranged from $10,000 in January, to $882.65 on March 19, 1934." Del Guzzo's bank statement, which is in evidence, shows that January 9, 1934, he deposited with appellant $10,900, which gave him that day a credit of something over eleven thousand dollars, thereby, literally, justifying France's statement as to the maximum amount in Del Guzzo's checking account. The next day, the account was reduced to $5,400; by January 12th, it was down to $2,200; while by January 22nd, it was less than one thousand dollars. From then on to March 19th, the account was generally under one thousand dollars, and when it arose a little above that amount, was promptly reduced. For several days (March 14th for

one), the account was in red figures. The statement in France's letter, while technically true, was extremely misleading.

The further statement that Del Guzzo had just finished the Maryhill contract, "costing around forty thousand dollars, on which he claims that he made good money, and I believe he did," gave a wrong impression of the situation. Speaking from the financial standpoint, the Maryhill job had been inextricably confused with prior contracts, and while it is probable that Del Guzzo made little or nothing on the Maryhill contract, whether he had or not was of little importance, as all the money was or would be appropriated to the payment of Del Guzzo's bills, leaving him still indebted to the bank in a sum amounting to more than fourteen thousand dollars.

This letter was written to Nepple, who, as France must have known, was fully advised as to Del Guzzo's financial situation. It was, then, written to Nepple for some purpose other than to convey information to him. Nepple represented respondent, which fact, of course, the bank knew, and the conclusion is inescapable that this letter was written to be used in inducing Nepple's principal to furnish a bond for Del Guzzo on the Skagit contract.

As part of the plan, April 21st, Nepple, purporting to act for respondent, executed the bond or agreement guaranteeing payment within six months of the Maryhill claims, which the bank held by assignment. The execution of this document, of which we are convinced respondent was then, and until the trial, ignorant, constituted a gross breach of trust on Nepple's part. That portion of the memorandum opinion of the trial court relating to this transaction is quoted above. It would seem that no reasonable business man could seriously believe that, in executing this agreement on behalf of

his principal, Nepple was acting in good faith. On cross-examination, France testified that he had forgotten all about the document, which purported to secure an indebtedness to his bank of something over fifteen thousand dollars. Del Guzzo stated that, when he testified by deposition prior to the trial, he had forgotten all about the bond, but that later he saw it in the office of the bank's attorney. An assistant cashier of the bank testified that he had seen the bond in the custody of the bank.. The attorney for the bank, testifying as a witness for appellant, stated that the Maryhill file containing the bond had been lost, and was found only a few days before the trial.

As stated by the trial court, the premium paid on this bond was never remitted or reported to respondent. No number was ever assigned to the bond by Nepple, contrary to the accepted practice of respondent, and all the facts clearly indicate that respondent was not to be advised of the fact that any such document had been executed. If the Skagit contract had produced money enough to pay for itself and Del Guzzo's prior indebtedness, the bond could have remained a forgotten document, but unfortunately, the performance of the Skagit contract led to no such desirable result.

As above stated, Central Surety and Insurance Corporation, which was to underwrite for respondent a portion of the Skagit bond, early in June, 1934, wrote to the bank at Montesano, asking for Del Guzzo's credit rating, and enclosing a blank form to be filled out by the bank. Under date June 11, 1934, France wrote to Del Guzzo concerning this matter:

"Dear Tony:

"Enclosed you will find a blank to be filled out by us for the Central Surety & Insurance Corp., shall we supply this information, if so kindly return the blanks to us, but if you would sooner that we not supply the

information kindly destroy the blanks, we do not like to give out information without first getting the consent of the parties inquired about."

Under date June 13th, Del Guzzo answered as follows:

"Dear Mr. France:

"I am returning the blanks you sent me. I would like to have you consult Ed Nepple concerning them. I do not know anything about them nor about that company, but it is possible that Ed is changing companies. If he puts his O. K. on them, it is all right with me for you to fill them out."

The bank then accomplished the questionnaire. Paragraph 2 reads as follows:

"Have you any knowledge of any unfavorable circumstances surrounding contract under consideration or any other contracts being performed by our applicant?"

to which the bank answered "No."

The following questions are contained in paragraph 3:

"Financial Statement of applicant at the close of business on the *19* day of *March, 1934,* shows balance subject to check, deposited in your bank *$882.65.* Is this statement as to balance in accord with your records? YES. If not, please give actual balance as shown by your records: $............................ When was the account opened? ............................ What is average balance? ............................ Is this account wholly satisfactory? ............................"

Evidently the typed portions of the first question, which are herein underscored, were written in by the surety company. The bank simply wrote the word "Yes," as above indicated in capitals, and ignored the other questions in the paragraph.

By paragraph 4 there was requested a

"Financial statement of date given above disclosed indebtedness to you as follows:

"Notes Payable $............................ Due ...........................
"Security for endorsement: ...................................................
"Purpose of Loan: ..........................................................
"Is this statement of indebtedness in accordance with your records? ..................... If not, please give details. ..................................................................."

The bank ignored this paragraph.

Paragraph 6 contains the following question: "Has applicant assigned to you payments due or to become due on any contract as security for loan?" which the bank answered "Yes."

Paragraph 11 reads as follows: "Have you any knowledge of any pending liens, claims or suits which may affect contractor's credit?" This question the bank answered "No."

To the last question, "What is your estimate of applicant's net worth?" the bank answered, "His statement shows a net around $20,000."

Certainly, the bank's answers, which were dated June 18th, did not give the true picture. Of course, it can be contended that the bank did not have to answer paragraph 4, *supra,* concerning Del Guzzo's indebtedness to it, as the question referred to the statement which Del Guzzo had made, which disclosed no indebtedness to the bank. This is, however, a two-edged sword, and cuts both ways. It would seem that the paragraph should have been fully and truly answered, if the questionnaire was to be answered at all. The bank's answer to paragraph 11, however, in which it is categorically stated that France had no knowledge of any pending liens or claims which might affect Del Guzzo's credit, was clearly not in accord with the facts. While the bank might have refused to answer the questionnaire at all, it is difficult to imagine upon what theory such an equivocal answer can be justified. The answer to question 2 was not candid. Of course, even as late as June, if respondent had learned the true

situation, it could have taken steps to protect itself, and probably avoided serious complications.

Out of the May estimate under the Skagit contract, appellant received something over twenty-four hundred dollars, most of which was applied on Del Guzzo's indebtedness carried over from the Maryhill contract. Out of the June estimate, appellant, during the month of July, received ten thousand dollars, which was apparently all applied on Maryhill obligations. Of the July estimate, paid in August, appellant received six thousand dollars, out of which were paid the remaining Maryhill obligations, the balance being applied on Del Guzzo's note for six thousand dollars, dated April 23, 1934.

The testimony and letters in evidence clearly show that appellant was at all times maintaining contact with Del Guzzo, keeping advised as to the progress of the work. June 15th, a claim referred to as the "Coluccio claim" was settled with appellant at its Seattle bank. This claim amounted to $3,400, and was paid by Del Guzzo with two checks, one for $1,300, drawn on appellant's Montesano branch, and one for $2,100, by check on the Pacific National Bank of Seattle, out of the payment made under the Skagit contract which Del Guzzo had deposited in that bank. This latter check was returned by appellant to the Pacific National Bank, with the request that its cashier's check be forwarded.

Shortly after settlement of this claim, France wrote Del Guzzo regarding the latter's "indebtedness to this bank," which France stated to be over thirty thousand dollars, hoping that he would receive "the interest and some of the old indebtedness soon." In response to this letter, Nepple called on France, as reported in a letter from Nepple to Del Guzzo, dated June 23d. In the course of this letter, Nepple informed Del Guzzo:

"Had a good talk with France, and explained to him that you are holding the balance there in the Pacific National in order to build up a line of credit there, which seemed to satisfy him fully. I told him that you would probably be able to remit the full amount of your next estimate, plus the State Highway Dept. money, but was unable to tell him when the next estimate would be."

Ten thousand dollars of the June estimate was, during the month of July, by Del Guzzo paid to appellant by a Pacific National Bank cashier's check, France having written to Del Guzzo the day before the payment was received a letter in which he stated:

"Was talking to Ed a few minutes ago and he says that we may expect $10,000 within a day or two, and from the state possibly next week.

"Hope that you are doing as well on the job as you expected to."

The ten thousand dollars expected "within a day or two" could come only from the Skagit job. The money from the state probably referred to Del Guzzo's claim for extras on the Maryhill contract, which claim was for four thousand dollars, of which the state finally allowed a little less than three hundred dollars.

On August 4, 1934, France wrote to Del Guzzo:

"I told them [the Seattle office] that we had not received payment from the State, Lewis county or Mason county, still they think that the account should not be increased so fast on the Deception Pass job.

"I wish you would send me the following information so I can send it to them. The original contract price of the Deception Pass job. The amount you have received from the State to date on the job. The amount of your next estimate, and when it will be paid. How near the job is completed . . ."

During the month of August, appellant received, by way of a cashier's check drawn by the Mount Vernon bank, six thousand dollars, which it applied on Del

Guzzo's old account. Appellant received no more money from the Skagit contract. September 18th, France wrote to Del Guzzo a letter in which he said:

"I beg to advise you that Ed brought in a warrant from Mason county for $1121.61 . . .

"I presume there will be another substantial payment coming in from the State very soon on some of the indebtedness which we are now holding."

This manifestly refers to money due Del Guzzo under the Skagit contract, the evidence showing that this job, having been financed with emergency relief furnished through the state, was often referred to as a "state job." It appears that, in a letter written to Del Guzzo during the month of August, France had referred to money coming under the Skagit contract as "received from the state." In a letter dated October 18th France wrote Del Guzzo:

"You must have received an estimate from the State this month. We have been criticized by the head office for going as far as we have. Tried to get you over the telephone this A.M. but was informed that you were in Portland."

This could refer only to the Skagit contract, France admitting that he presumed that such was the fact.

We are convinced that France and appellant knew that the payments which Del Guzzo had made were money which Del Guzzo had received on account of the Skagit contract. These payments totaled over eighteen thousand dollars, and out of this sum appellant paid over fifteen thousand dollars of Del Guzzo's Maryhill obligations owned by appellant.

■ Appellant, of course, strenuously insists that none of its officers or agents at any time participated in any conspiracy which renders it at all liable to respondent, contending that its officers were simply protecting its interests in a perfectly proper and legal manner. The trial court heard and saw all the wit-

nesses, and reached a conclusion contrary to appellant's contentions. In this connection, it must always be borne in mind that, during the month of March, 1934, appellant, as assignee, held over fourteen thousand dollars worth of claims against the Maryhill contract, for which it has always contended that respondent was liable upon its performance bond on the Maryhill contract. It is inconceivable that, had respondent been advised of the true situation, it would have furnished a performance bond for the Skagit contract. Nepple's bad faith toward respondent, his principal, is too plain for argument.

We are constrained to hold that the trial court correctly analyzed the evidence, and held that, by reason of its conduct, appellant had become in law liable to respondent. The record convinces us that appellant well knew that money which it was receiving and applying on Del Guzzo's indebtedness based on the Maryhill job came to Del Guzzo from the Skagit contract, and should have been applied in payment of claims for which respondent was liable under its performance bond on that job.

Appellant argues that, in writing to Nepple the letter in which he stated that Del Guzzo's balance March 19, 1934, amounted to $882.65, France was not acting as appellant's agent, in that he had no authority to write any such letter or make such statements. In this connection, we are convinced that the rule stated by this court in the case of *Community State Bank v. Day*, 126 Wash. 687, 219 Pac. 43, is applicable. In the course of that opinion, the court said:

"There is no merit in appellant's contention that it is not responsible for the misrepresentations of its cashier, assuming any were made. The note in suit was made to the bank, the plaintiff in this action. Its cashier induced the giving of it, as decided by the verdict. The amount of the note was at once passed to

the bank, through its cashier, to the credit of the meal company's note upon that company's note to the bank not yet due. The cashier in the transaction was engaged in the business of the bank, and his knowledge was the bank's knowledge. *Hitt Fireworks Co. v. Scandinavian American Bank,* 114 Wash. 167, 195 Pac. 13, 196 Pac. 629; *First Nat. Bank of New Bremen v. Burns,* 88 Ohio St. 434, 103 N. E. 93, 49 L. R. A. (N. S.) 764; 7 C. J., Banks and Banking, § 134, p. 530."

Appellant, in order to advance its own interests, identified itself with Del Guzzo, its debtor, being most anxious that Del Guzzo should continue to engage in the contracting business so that appellant could receive, in one way or another, the money which Del Guzzo owed. In so far as appellant's efforts were directed to the assistance of Del Guzzo in procuring contracts with the hope that the latter, out of the profits of these contracts, could repay appellant, the latter's efforts on Del Guzzo's behalf were praiseworthy, but when these efforts led appellant's officers to mislead respondent into assuming a position which it would not have taken had it known the true facts, a different situation at once arose.

Appellant was not acting merely gratuitously on behalf of Del Guzzo. He and appellant were bound together by a strong community of interest. Indeed, appellant's interest was at least as great as that of Del Guzzo, as it is unlikely that Del Guzzo could even hope to realize out of the Skagit contract a profit sufficiently large to pay all the expense of the work and what he owed the bank on old accounts, and leave a worthwhile profit over for himself.

In the case of *Carpenter Lumber Co. v. Hugill,* 149 Wash. 45, 270 Pac. 94, this court, referring to a contract of suretyship, said:

"It is the rule that parties to contracts of this sort, as in all other contracts, must exercise towards each

other entire good faith, and that any concealment of facts which materially affects the contract, or which induces a party to enter into a contract which he would not otherwise enter into, avoids it. As was said in *Griswold v. Hazard,* 141 U. S. 260:

" ' "The contract of suretyship," says Mr. Story, "imports entire good faith and confidence between the parties in regard to the whole transaction." ' "

In this connection, the cases of *New York Indemnity Co. v. Hurst,* 252 Ky. 59, 66 S. W. (2d) 8, 94 A. L. R. 864; *Copper Process Co. v. Chicago Bonding & Ins. Co.,* 262 Fed. 66, 8 A. L. R. 1477; *United States v. American Bonding & Trust Co.,* 89 Fed. 921, are of great interest, and support respondent's argument that, under the circumstances of this case, appellant failed to use toward respondent that degree of good faith which the law requires. The text found in 5 Couch Cyc. of Ins. Law, 4265, § 1189 *et seq.,* should also be read in this connection, as should Stearns on The Law of Suretyship (4th ed.), § 15. As to the duty of appellant to fully advise respondent as to the facts, the text found in 26 C. J., title "Fraud," 1074, § 17, is of interest, the rule being laid down that

"A duty to speak may arise from partial disclosure, the speaker being under a duty to say nothing or to tell the whole truth. One conveying a false impression by the disclosure of some facts and the concealment of others is guilty of fraud, even though his statement is true so far as it goes, since such concealment is in effect a false representation that what is disclosed is the whole truth."

Later in the same title, 1100, § 31, it is said:

"Fraudulent misrepresentation may be effected by half truths calculated to deceive. Thus a representation literally true is actionable if used to create an impression substantially false, as where it is accompanied by conduct calculated to deceive."

The following text found in 21 R. C. L., title "Principal and Surety," 989, § 38, is pertinent to this inquiry:

"If a surety, before entering into the contract of suretyship, applies to the creditor for information touching any material matter, he is bound, if he assumes to answer the inquiry at all, to give full information as to every fact within his knowledge, and he can do nothing to deceive or mislead the surety without vitiating the agreement. Whether he is bound before accepting the undertaking of the surety voluntarily to inform him of facts within his knowledge which increase the risk of the undertaking depends on the circumstances of the case. The rule seems to be that if he knows or has good grounds for believing that the surety is being deceived or misled, or that he was induced to enter into the contract in ignorance of facts materially increasing the risks, of which he has knowledge, and he has an opportunity, before accepting his undertaking, to inform him of such facts, good faith and fair dealing demand that he should make such disclosures to him; and if he accepts the contract without doing so, the surety may afterward avoid it, though the failure to disclose such facts was not wilful or intentional. The test as to whether a disclosure should be voluntarily made by a creditor of one who is about to become a surety for a debt is, it has been said, whether there is a contract between the debtor and the creditor to the effect that the position of the surety shall be different from that which he might expect. Thus, it has been held that if a surety signs without knowing the exact amount, but supposing it was for the purchase price of certain goods, and the creditor knows this to be the belief of the surety, but also knows that the amount included a pre-existing debt, his failure to inform the surety is in law a fraud that will release the surety from the entire contract."

The trial court had the advantage of hearing and seeing the witnesses, and in so far as it determined questions of fact, its judgment on such questions carries considerable weight. We are in hearty accord with

the doctrine that, generally speaking, respondent was entitled to have the proceeds of the Skagit contract applied in payment of obligations which arose pursuant to that contract.

Appellant does not seriously criticize the rule first laid down in the case of *Crane Co. v. Pacific Heat & Power Co.,* 36 Wash. 95, 78 Pac. 460, and followed in *Hughes & Co. v. Flint,* 61 Wash. 460, 112 Pac. 633, and *Kane & Co. v. Woodbury Lumber Co.,* 121 Wash. 149, 208 Pac. 1107, to the effect that funds known to be received as the proceeds of a particular contract should be applied in payment of debts incurred in carrying out that contract. *United States v. Johnson, Smathers & Rollins,* 67 F. (2d) 121. Examination of the record convinces us that appellant well knew that thousands of dollars which it received from Del Guzzo came from the Skagit contract, and nevertheless applied the money in payment of Del Guzzo's obligations to appellant which arose out of contracts other than the Skagit job. At least several of the bills, amounting to a considerable sum, incurred by Del Guzzo in carrying out the Skagit contract and paid by appellant, were not charges against the bond written by respondent. It is also clear that Del Guzzo, Nepple, and appellant planned to pay Del Guzzo's prior obligations with the proceeds of the Skagit contract. Of this plan, respondent was ignorant, and under the facts is not chargeable with Nepple's knowledge or actions.

In this case, respondent was not executing a bond directly to appellant, but did execute one upon which appellant now seeks to hold respondent liable. It is also clear that appellant expected to rely upon any bond which respondent might execute.

The judge before whom the case was tried below found that appellant, Del Guzzo, and Nepple fraudulently conspired to cause respondent to execute Del

Guzzo's bond. The views of the court are clearly expressed in the memorandum opinion, portions of which are above quoted, and again in an oral ruling made after the memorandum opinion was filed, in which the court said:

"Gentlemen, I have examined the authorities cited by counsel in so far as I was able during the brief recess time, but I am satisfied that it cannot be successfully contended here that this was not a fraudulent transaction. Now, the sole purpose of the dealings between the bank and Mr. Del Guzzo was the financing of Del Guzzo in those various contracts which would be a legitimate banking activity within the definition given by the statute. The manner in which it was brought about, the conduct of the various parties involved, of course, as I heretofore found, amounted to a fraudulent transaction, fraudulent dealings."

After careful consideration of the record before us, in the light of the authorities, both decided cases and standard texts, we are of the opinion that the trial court correctly ruled that appellant should be held liable to respondent.

In this connection, appellant urges that, if in fact Mr. France made or participated in any misrepresentation, such an act was beyond the scope of his duties and powers, and was beyond the power and authority of the bank. Appellant cites many authorities in this connection; some cases decided by the supreme court of the United States, others by inferior Federal courts, and others by state courts. It has been held that a national bank is not responsible for negligence which may have resulted in injury to another, but from which the bank received no enrichment. While the bank received no enrichment as the result of the plan which it was attempted to put into effect, if the scheme had succeeded the bank would have very

materially recouped its losses. The plan was for the financial benefit of the bank, and it should bear the burden as it would have enjoyed the benefits, if any had accrued.

Appellant is a national bank, and it has often been held that such an institution is not bound by contracts *ultra vires*. Examination of the authorities convinces us that the principle relied on by appellant does not apply to the facts of this case, and that appellant's responsibility to respondent is not affected by the fact that appellant is a national bank.

Appellant also argues that, even though respondent be entitled to recover, the trial court failed to apply the proper measure of damages, and that in no event should respondent be allowed to recover any sum in excess of the amount of Del Guzzo's indebtedness to the bank at the time Del Guzzo's financial statement was prepared, from which his indebtedness to the bank was omitted. The doctrine contended for by appellant does not apply to the facts of this case, and the trial court correctly ruled upon this phase of the litigation.

Appellant also argues that the trial court allowed respondent to recover certain items which it paid on account of Del Guzzo's supplemental Skagit contract, and that appellant was prejudiced by this ruling of the trial court. As to the matter of this supplemental contract and the net financial result thereof, the record is not clear, and we find no basis therein for holding that the trial court erred in this connection.

By his contract with respondent, Del Guzzo agreed to save respondent harmless against "all liability, damages, loss, charges and expenses, of whatsoever kind or nature, including counsel and attorney's fees," which respondent might be called upon to sustain or incur by reason of having executed Del Guzzo's

bond. Respondent claimed a large amount by reason of expenditures for attorney's fees and other matters in connection with the facts which are the bases of this litigation. In its decree, the trial court stated that respondent's expenses, as proved, were reasonable and proper; that respondent holds a valid assignment from Del Guzzo of the pre-final estimate and the retained percentage on the Skagit county contract; and that there were no valid and unpaid claims against the bond or the retained percentage.

The money which Skagit county paid into court did not belong to appellant, and Del Guzzo, under his contract with respondent above referred to, was bound to reimburse respondent for its expenses, as provided in the contract. While appellant was not liable to respondent for any such disbursements, it cannot complain if respondent be reimbursed out of the retained percentage on the Skagit contract which the court awarded to respondent. Upon the record herein, appellant cannot invoke any equitable doctrine which would entitle it to claim that the retained percentage should be applied first in reduction of the amount for which the trial court granted respondent judgment against both appellant and Del Guzzo.

Finally, appellant contends that the trial court should have granted it judgment over against Del Guzzo. This contention appears to be well founded. The bank appealed from the entire judgment. Del Guzzo has not participated in the appeal, nor has he filed any brief in this court. The judgment appealed from will be modified by adding a provision to the effect that appellant may have judgment against A. Del Guzzo for any amount which it is required to pay respondent. In all other particulars, the judgment appealed from is affirmed.

As the modification of the judgment no wise affects

or concerns respondent's case, respondent will recover its costs in this court.

MAIN, HOLCOMB, MILLARD, BLAKE, ROBINSON, and SIMPSON, JJ., concur.

STEINERT, C. J., and GERAGHTY, J., did not participate.