[No. 50238–2. En Banc. September 5, 1985.]

PUBLIC UTILITY DISTRICT NO. 1 OF LEWIS COUNTY,
ET AL, *Respondents,* v. WASHINGTON PUBLIC
POWER SUPPLY SYSTEM, *Respondent,*
CHEMICAL BANK, *Appellant.*

354

*Betts, Patterson & Mines, P.S.,* by *Michael Mines* and *Kim C. Pflueger* (*Cravath, Swaine & Moore,* of counsel), for appellant Chemical Bank.

*Gordon, Thomas, Honeywell, Malanca, Peterson & O'Hern,* by *Albert R. Malanca, Kenneth G. Kieffer,* and *Donald S. Cohen,* for respondent Washington Public Utilities Group.

*Culp, Dwyer, Guterson & Grader,* by *Richard C. Yarmuth, Earle J. Hereford, Jr., Susan L. Guthrie,* and *Ellen D. Bowman,* for respondent Washington Public Power Supply System.

*Williams, Novack & Hansen, James D. Twisselman,* and *Jeffrey E. Pratt,* for respondent Snohomish County PUD 1.

*Ralph K. Nickerson, Leavy, Schultz & Sweeney,* and *Steven J. Palmer,* for respondents Klickitat and Franklin Counties PUD's 1.

*Platt, Irwin, Colley, Oliver, Miller & Wood,* by *Craig L. Miller, Bart G. Irwin,* and *Stephen E. Oliver,* for respondent Clallam County PUD 1.

*Roberts & Shefelman,* by *George M. Mack, Joni H. Ostergaard,* and *Bennet A. McConaughy,* for respondents City of Richland, et al.

*Mary M. Gibbons, Gary A. Dahlke, Richard D. McWilliams, Theodore J. Collins, Donald G. Kari,* and *Stephen S. Walters* on behalf of Washington Water Power Co., Puget Sound Power and Light Co., and Pacific Power and Light Co., amici curiae for respondents.

*William R. Squires III* and *Stephen M. Rummage,* amici curiae.

PEARSON, J.—In these consolidated cases, the Washington Public Power Supply System (WPPSS) and Chemical Bank challenge several summary judgments entered against them in the King, Lewis, and Benton County Superior Courts. The questions presented relate to loans advanced to WPPSS by numerous public utility districts (PUD's), municipalities and rural electric cooperatives to assist in the orderly preservation (mothballing) and subsequent termination of Washington nuclear plants (WNP) 4 and 5. The trial courts concluded that the loans were immediately due and payable. In addition, the Lewis County judge ruled that money transferred by WPPSS to Chemical Bank following the maturation of the termination loans constituted a conversion. We now reverse the conversion judgment against Chemical Bank, affirm the orders holding the notes due and payable, limit the funds accessible for payment, and remand for a determination of attorney fees.

FACTS

WPPSS is a joint operating agency formed pursuant to

RCW 43.52.360 and comprised of 19 Washington PUD's and four cities. In 1974 WPPSS decided to construct WNP 4 and 5. To facilitate construction of these plants, WPPSS entered into "Participants' Agreements"[1] with 88 PUD's, municipalities, and rural electric cooperatives (Participants) and adopted resolution 890 (the Bond Resolution). The Bond Resolution provided a plan for the construction of the plants and the issuance of revenue bonds. The Participants' Agreements contractually obligated the Participants to purchase power produced by WNP 4 and 5, thus enabling WPPSS to cover debts incurred in constructing the plants. Pursuant to these documents, WPPSS issued $2.25 billion in municipal bonds and began construction of the plants.

In the fall of 1981, when the plants were only partially constructed, it became apparent that further financing for the plants was doubtful. WPPSS therefore sought a way to mothball the plants until additional financing became available. Hence WPPSS adopted resolutions 1199 and 1201 authorizing execution of loan agreements to pay the costs of mothballing and issuance of subordinated revenue notes as evidence of the loans. In accordance with resolutions 1199 and 1201, certain Participants entered into "Participants Agreements to Advance Funds" in which they agreed to loan WPPSS money for the mothballing of WNP 4 and 5. These agreements are collectively known as bridge loans. As evidence of the loans, WPPSS issued subordinated revenue notes bearing a maturity date of July 1, 1984.

Despite the money advanced through the bridge loans, the attempt to delay construction of WNP 4 and 5 was unsuccessful. Consequently, on January 22, 1982, WPPSS adopted resolution 1204 formally terminating the plants and authorizing the execution of agreements for the

---

[1]This court recently invalidated these agreements in *Chemical Bank v. WPPSS*, 99 Wn.2d 772, 666 P.2d 329 (1983) (*Chemical Bank* I), and *Chemical Bank v. WPPSS*, 102 Wn.2d 874, 691 P.2d 524 (1984) (*Chemical Bank* II).

advancement of termination costs and the issuance of subordinated revenue notes. Thereafter certain Participants entered into "Participants Agreements to Advance Termination Costs". These agreements are collectively known as termination loans. As evidence of the indebtedness, WPPSS issued subordinated revenue notes bearing a maturity date of June 30, 1983.

Following termination of WNP 4 and 5, disputes arose over whether, pursuant to the Participants' Agreements, the Participants owed WPPSS sufficient money to pay the bonds, despite the fact that the plants would never yield power. This court eventually resolved these disputes in *Chemical Bank v. WPPSS,* 99 Wn.2d 772, 666 P.2d 329 (1983) (*Chemical Bank* I) and *Chemical Bank v. WPPSS,* 102 Wn.2d 874, 691 P.2d 524 (1984) (*Chemical Bank* II). In the meantime, it became apparent that without receipt of the money from the Participants, WPPSS would soon be unable to meet its financial obligations as they became due, including payments owed pursuant to the Bond Resolution. Prior to any notice of default, however, Chemical Bank was enjoined from declaring a default with respect to WPPSS' obligations to the bondholders. Thereafter, WPPSS failed to make the payments required by the Bond Resolution.[2] In addition, on June 30, 1983, WPPSS failed to fulfill its obligations on the termination loans. Shortly thereafter the termination lenders began demanding repayment. The bridge lenders also began demanding repayment on the grounds that WPPSS' inability to meet its obligations in May 1983 constituted an anticipatory breach of the bridge loans.

On June 15, 1983, this court decided *Chemical Bank* I wherein it was determined that the 28 Washington PUD's and municipalities which were WPPSS participants lacked the authority to enter into the Participants' Agreements. Consequently, on July 22, 1983, WPPSS admitted its

---

[2]As of June 30, 1983, WPPSS had failed to make payments then due to the bond fund of at least $29,685,000.

inability to pay its debts incurred in the ownership and operation of WNP 4 and 5. At the same time the injunction imposed against Chemical Bank was lifted. On July 25, 1983, pursuant to Chemical Bank's request under section 11.3 of the Bond Resolution,[3] WPPSS transferred $723,255.70 in cash and $24,841,832.79 in United States Treasury bills to Chemical Bank. The cash and treasury bills, derived primarily from the construction fund,[4] constituted virtually all of the remaining funds of WNP 4 and 5. On August 18, 1983, Chemical Bank declared the principal of all bonds and interest accrued thereon immediately due and payable.

Following Chemical Bank's declaration, several bridge and termination lenders filed actions against WPPSS. In addition, in its Lewis County action against WPPSS, one group of lenders, the Washington Public Utilities Group (WPUG), added Chemical Bank as a defendant and moved for summary judgment against the Bank for conversion of the funds transferred to the Bank on July 25, 1983. Thereafter, summary judgment orders were entered against WPPSS on its obligations to repay the loans. The trial judges concluded that WPPSS' affirmative defenses failed to present genuine issues of material fact and that pursuant to RCW 43.52.391 the loans were due and payable. In addition, the Lewis County judge stated that pursuant to either RCW 43.52.391 or the loan agreements the loans were due and payable. The orders stated the judgments were payable

---

[3]Section 11.3 provides in relevant part:

"If an Event of Default shall happen and shall not have been waived or remedied, the Extraordinary Reserve Fund Trustee upon demand of the Bond Fund Trustee shall pay over, and the System covenants that upon demand of the Bond Fund Trustee the System shall pay over, to the Bond Fund Trustee (i) forthwith, all moneys, securities and funds then held by them and pledged under the Resolution, and (ii) as promptly as practicable after receipt thereof, all income, revenues, receipts and profits derived from the ownership and operation of the Projects (all such moneys in this Article collectively called 'Revenues')."

[4]The "construction fund" is a special fund created for the purpose of paying the costs of construction. Bond Resolution § 6.8. The money in this fund was derived primarily from the sale of bonds.

from proceeds of revenue bonds, from operating revenues, or from any other fund of the agency. In addition, two of the orders specified the judgments were not restricted to proceeds, funds or revenues of WNP 4 and 5.

After judgment against WPPSS was entered in the WPUG's action, several lenders sought to intervene against Chemical Bank. Intervention, however, was denied and the trial judge entered judgment against Chemical Bank and in favor of WPUG. Thereafter WPPSS appealed the judgments to the Court of Appeals. Chemical Bank appealed its judgment directly to this court as did the intervenors. On motion of Chemical Bank, we transferred the cases from the Court of Appeals and consolidated all actions for review by this court.

## I

### AFFIRMATIVE DEFENSES

We begin our resolution of this case by addressing WPPSS' contention that the bridge and termination loans should not have been held due and payable without a trial of the material factual issues raised by WPPSS' affirmative defenses and that it was error for the trial courts to either strike or fail to certify portions of affidavits submitted by WPPSS in opposition to the summary judgment motions. We see little merit in either of these arguments and conclude that the striking and failure to certify two affidavits does not amount to prejudicial error. We further conclude that the trial courts did not err in finding, as a matter of law, that there exist no genuine issues of material fact upon which reasonable persons could differ. *See Olympic Fish Prods., Inc. v. Lloyd,* 93 Wn.2d 596, 611 P.2d 737 (1980).

WPPSS argues that in two of the eight lower court actions, two of its affidavits were improperly stricken or not certified as part of the record. CR 56(e) requires that affidavits submitted in summary judgment proceedings be made on personal knowledge, set forth admissible evidentiary facts, and affirmatively show the affiant is competent to testify as to his averments. *Meadows v. Grant's Auto*

*Brokers, Inc.,* 71 Wn.2d 874, 878, 431 P.2d 216 (1967). Although CR 56(e) makes no distinctions between affidavits of the moving and nonmoving parties, the drastic potentials of a summary judgment motion compel the courts to indulge in leniency with respect to affidavits presented by the nonmoving party. *Meadows,* at 879. Such leniency, however, does not permit stepping beyond the indulgence of the court and statements of conclusions and other surplusage contained in an affidavit will be disregarded. *Peninsula Truck Lines, Inc. v. Tooker,* 63 Wn.2d 724, 726, 388 P.2d 958 (1964). In the instant case the stricken portions of WPPSS' affidavits contained conclusional statements which neither the trial court nor this court may consider in passing upon motions for summary judgment. In addition, although the two trial courts may have erred in refusing to certify WPPSS' affidavits as part of the record, it is not every error that is reversible error. *See Thomas v. French,* 99 Wn.2d 95, 104, 659 P.2d 1097 (1983); *Ashley v. Lance,* 80 Wn.2d 274, 282, 493 P.2d 1242, 62 A.L.R.3d 962 (1972); *Capen v. Wester,* 58 Wn.2d 900, 902, 365 P.2d 326 (1961). Because the cases have been consolidated on appeal, all of WPPSS' affidavits are part of the record. Hence, the failure to certify two affidavits in two of the eight cases constitutes, if anything, harmless error.

We turn now to the question whether there are genuine issues of material fact which necessitate a trial. WPPSS contends the bridge and termination loans were made under the assumption that the Participants' Agreements were valid and enforceable and consequently this court's subsequent invalidation of the Participants' Agreements indicates the parties to the loans were mutually mistaken as to a basic assumption of the loan agreements. In the alternative, WPPSS argues that this court's invalidation of the Participants' Agreements has made performance of the loan obligations impossible and the lenders have either waived their right to repayment of the loans or are estopped from seeking repayment.

## A
### MUTUAL MISTAKE

■ Equity may allow avoidance of a contract when both parties independently make a clear bona fide mutual mistake. *Simonson v. Fendell,* 101 Wn.2d 88, 675 P.2d 1218 (1984). The parties must have been mistaken as to a basic assumption of the contract and the party seeking avoidance must not have borne the risk of the mistake. Restatement (Second) of Contracts § 152 (1981). Courts and commentators generally agree that the term "basic assumption" means the mistake must vitally affect the basis upon which the parties contract. *See* 13 S. Williston, *Contracts* § 1544 (3d ed. 1970); J. Calamari, *Contracts* § 9–26 (2d ed. 1977); Rabin, *A Proposed Black–Letter Rule Concerning Mistaken Assumptions in Bargain Transactions,* 45 Tex. L. Rev. 1273 (1967). Ordinary shifts in market conditions or financial ability do not justify avoidance under the rules governing mistake. Restatement (Second) of Contracts § 152, comment *b* (1981); *Leasco Corp. v. Taussig,* 473 F.2d 777 (2d Cir. 1972). It is similarly agreed that a party bears the risk of mistake when, at the time the contract is made, the party is aware of limited knowledge with respect to the facts to which the mistake relates but treats such limited knowledge as sufficient. Restatement (Second) of Contracts § 154 (1981); *see also Bailey v. Ewing,* 105 Idaho 636, 671 P.2d 1099 (Ct. App. 1983); *Covich v. Chambers,* 8 Mass. App. Ct. 740, 397 N.E.2d 1115 (1979). It is said in such a situation that there is no mistake; instead, there is an awareness of uncertainty, a conscious ignorance of the future. 3 A. Corbin, *Contracts* § 598 (1960).

In the instant case we do not believe there was a mutual mistake. The Participants' Agreements did not constitute a basic assumption of the loan contracts. Although WPPSS may have hoped sufficient funds would be received via the Participants' Agreements to repay the loans, it was not certain in 1981 and 1982 that such funds would be forthcoming. Our invalidation of the agreements has not rendered the contracts materially more unequal than it would have

had the facts been as the parties allegedly hoped. Rather, the mistake has merely affected WPPSS' financial ability to repay the loans. Such a change does not constitute grounds for avoidance of the contracts.

In addition, avoidance would be inappropriate in light of the evidence indicating WPPSS bore the risk of the alleged mistake. The bridge and termination loans were made in late 1981 and early 1982 when completion of WNP 4 and 5 was debatable. At the time a lawsuit was pending questioning the legal existence of WPPSS and its corporate powers with respect to the construction of nuclear reactors. Under the terms of the loan agreements the Bonneville Power Administration (BPA) was to act as escrow agent. The escrow agreement between the BPA and WPPSS provided that the funds received by the BPA from the lenders would be dispersed to WPPSS only if WPPSS delivered to the BPA opinion letters concerning the authority, execution and delivery of the Participants' Agreements. WPPSS fully complied with this requirement and represented to the BPA and the lenders that the Participants' Agreements constituted valid, binding agreements enforceable in accordance with their terms. In addition, there is no evidence that the Participants warranted they would fulfill their obligations under the Participants' Agreements. Clearly, under these facts WPPSS bore the risk of the subsequent invalidity of the Participants' Agreements. A party who incurs an obligation with limited knowledge, conscious disregard of surrounding circumstances and awareness of uncertainty must bear the consequences of its decision. Hence, we hold the trial courts did not err in finding there were no genuine issues of material fact relating to WPPSS' affirmative defense of mutual mistake.

## B
### IMPOSSIBILITY OF PERFORMANCE

The doctrine of supervening impossibility or im—practicability of performance discharges a party from contractual obligations when a basic assumption of the con-

tract is destroyed or deteriorated, such destruction or deterioration makes performance impossible or impractical, and the party seeking relief does not bear the risk of the unexpected occurrence. Restatement (Second) of Contracts §§ 261, 263 (1981); *see also Cannon v. Huhndorf*, 67 Wn.2d 778, 409 P.2d 865 (1966). Although under this rule impossibility of performance may cover impracticability because of extreme and unreasonable difficulty, expense or injury, impossibility of performance is not the legal equivalent of inability to perform. *Cannon*, at 782. The mere fact that a contract becomes more difficult or expensive than originally anticipated does not justify setting it aside. *Liner v. Armstrong Homes of Bremerton, Inc.*, 19 Wn. App. 921, 926, 579 P.2d 367 (1978); *accord*, Annot., *Modern Status of the Rules Regarding Impossibility of Performance as Defense in Action for Breach of Contract*, 84 A.L.R.2d 12 (1962 & Supp. 1979).

Pursuant to these rules, we believe that although our invalidation of the Participants' Agreements may have made repayment of the loans more difficult, WPPSS' current financial inability to perform does not amount to impossibility or impracticability of performance so as to excuse WPPSS from its obligations on the loan agreements. Hence, we hold the trial courts did not err in finding, as a matter of law, that there were no genuine issues of material fact relating to WPPSS' affirmative defense of impossibility of performance.

## C
### WAIVER AND ESTOPPEL

WPPSS argues next that various Participants' failure to fulfill their obligations under the Participants' Agreements prior to this court's invalidation of such agreements constitutes a waiver of their rights and estops them from enforcing the loan agreements. To fully understand this argument, it is necessary to review the pertinent facts.

In 1976 the Participants, 88 PUD's, municipalities, and rural electric cooperatives, executed the Participants'

Agreements. In 1981 and 1982 many of these same PUD's, municipalities and cooperatives lent WPPSS money for the mothballing and termination of WNP 4 and 5. The loan agreements specified that funds received by WPPSS via the Participants' Agreements were to be used together with other funds to repay the loans. See resolution 1199, § 3. After making the loans, some Participants refused to fulfill their obligations under the Participants' Agreements. This court ultimately ruled in favor of the Participants. *See Chemical Bank* I and II. WPPSS argues, however, that various Participants' initial refusal to comply with the Participants' Agreements constitutes a waiver and estoppel of all rights granted in the loan agreements.

A waiver is the intentional and voluntary relinquishment of a known right or such conduct as warrants an inference of the relinquishment of such right. It is a voluntary act which implies a choice, by the party, to dispense with something of value or to forgo some advantage. *Bowman v. Webster,* 44 Wn.2d 667, 669, 269 P.2d 960 (1954). The one claimed to have waived a right must intend to relinquish such right, advantage or benefit and his actions must be inconsistent with any other intention than to waive them. *Bowman,* at 669.

Equitable estoppel is defined as requiring three elements: (1) an admission, statement, or act inconsistent with the claim afterward asserted; (2) action by the other party on the faith of such admission, statement, or act; and (3) injury to such other party resulting from allowing the first party to contradict or repudiate such admission, statement, or act. *Leonard v. Washington Employers, Inc.,* 77 Wn.2d 271, 280, 461 P.2d 538 (1969), citing *Arnold v. Melani,* 75 Wn.2d 143, 147, 437 P.2d 908, 449 P.2d 800, 450 P.2d 815 (1968). In order to create an estoppel, it is necessary that the party claiming to have been influenced by the conduct or declarations of another was either destitute of knowledge of the true facts or without means of acquiring such facts. *Chemical Bank* II, at 905.

Some Participants' failure to comply with the Par-

ticipants' Agreements is insufficient evidence of an intent to waive all rights under the loan agreements. Although the parties to the Participants' Agreements and loan agreements are the same, the documents evidence two separate transactions. As indicated earlier, the validity of the Participants' Agreements was not a basic assumption upon which the loan agreements were made; rather, they were only part of the financing scheme to be used for repaying the loans. Some Participants' decision to dispute the validity of the Participants' Agreements was not inconsistent with their intent to enforce the loan agreements. The mere fact that a party contests the validity of one agreement does not constitute a waiver of all other agreements which are in some way connected. Furthermore, WPPSS was neither destitute of knowledge of the true facts surrounding execution of all of the agreements nor without means of inquiring into the enforceability of the Participants' Agreements. Under such circumstances, WPPSS cannot now complain of the consequences of its failure to seek additional knowledge and make further inquiries. At the time these loans were made, WPPSS was aware of the financial problems facing WNP 4 and 5 and could have sought a declaratory judgment on the validity of the Participants' Agreements. For these reasons, we conclude the lenders neither waived their rights under the loan agreements nor are they now estopped from asserting such rights.

In summary, we conclude the trial courts did not err in entering summary judgments against WPPSS and ordering the bridge and termination loans immediately due and payable.

## II
### FORM OF JUDGMENT

Having determined that the loans are due and payable, we must now decide whether the form of judgment entered against WPPSS was correct. The trial courts held that pursuant to either RCW 43.52.391 or the language of the loan agreements all lenders, whether members of WPPSS or

not,[5] were entitled to repayment of the loans out of the proceeds of revenue bonds, operating revenues, or any other funds of the agency. In addition, two trial courts specifically allowed judgment to extend beyond WNP 4 and 5. WPPSS argues that the trial courts erred in reaching these conclusions because any judgment entered against it should have been limited to the special funds established for repayment of the loans, either the Note Retirement Fund, in the case of the bridge loans, or the 1982 Note Retirement Fund, in the case of the termination loans. (Hereinafter these two funds will be referred to as the Note Retirement Funds.) Our review of the applicable statutes and agreements leads us to conclude the trial courts erred.

## A
### INTERPRETATION OF RCW 43.52.391

Determination of the correct form of judgment must begin with a review of the statutory authority of joint operating agencies. Such agencies are formed for the purpose of acquiring, constructing, operating, and owning plants, systems, and other facilities for the generation of electricity and power. RCW 43.52.360. Joint operating agencies are authorized by law to issue revenue bonds payable from the revenues of the utility properties they operate. RCW 43.52-.3411. Revenue bonds can be evidenced by bonds, notes, bond anticipation notes, certificates of indebtedness, or commercial paper. RCW 43.52.250. When issuing revenue bonds an operating agency may establish special funds for the sole purpose of paying such bonds. RCW 43.52.3411. An operating agency's authority to create special funds and to pledge certain revenues to those special funds is similar to the power granted to public utilities. RCW 54.24.030. If a special fund is created, it generally cannot be used for any

---

[5]Of the 17 participants/lenders involved in this appeal, Public Utility District 1 of Mason County is the only nonmember. RCW 43.52.391 applies only to members. PUD 1 of Mason County was a party in the WPUG action. However, the Lewis County Judge held that, as to nonmembers, the loan agreements mandated repayment.

other purpose and the claims payable out of a special fund are usually not payable out of any other fund. *See* 15 E. McQuillin, *Municipal Corporations* § 39.45 (3d rev. ed. 1985).

In addition to the powers listed above, a joint operating agency may receive advances from its members. RCW 43.52.391 provides in part:

> Any member of an operating agency may advance or contribute funds to an agency as may be agreed upon by the agency and the member, and the agency *shall* repay such advances or contributions from proceeds of revenue bonds, from operating revenues or from any other funds of the agency . . .

(Italics ours.) This same statute, while prohibiting the issuance of general obligation bonds, provides joint operating agencies with most other powers granted to public utility districts.

> Except as otherwise provided in this section, a joint operating agency shall have all powers now or hereafter granted public utility districts under the laws of this state. It shall not . . . levy taxes, issue general obligations bonds, or create subdistricts.

Pursuant to RCW 43.52.391, it is clear WPPSS members were authorized to loan WPPSS money for the mothballing and termination of WNP 4 and 5. Furthermore, the statute unambiguously requires repayment. The Legislature's careful use of the words "may" and "shall" in RCW 43.52.391 indicates the Legislature considered the words to have different force. Although the term "may" allows some discretion, the term "shall" is directory and thus mandates repayment. *See State v. Huntzinger*, 92 Wn.2d 128, 594 P.2d 917 (1979). On the other hand, RCW 43.52.391 is somewhat ambiguous as to what funds can be used for repayment. RCW 43.52.391 provides at one point that the agency shall repay advances by its members from proceeds of revenue bonds, from operating revenues, "*or from any other funds of the agency*". (Italics ours.) Yet this same statute prohibits the issuance of general obligation bonds

and specifically grants to the agency most other powers granted public utilities. These inconsistencies create an ambiguity in the statute.

When the language of a statute is ambiguous, it is the judiciary's function to determine the true meaning. *State ex rel. McDonald v. Whatcom Cy. Dist. Court,* 92 Wn.2d 35, 593 P.2d 546 (1979). Several principles of statutory construction are relevant to this inquiry. In determining the meaning of words used but not defined in a statute, a court must give careful consideration to the subject matter involved, the context in which the words are used, and the purpose of the statute. *State v. Stockton,* 97 Wn.2d 528, 533, 647 P.2d 21 (1982). "Language within a statute must be read in context with the entire statute and construed in a manner consistent with the general purposes of the statute." *Nationwide Papers, Inc. v. Northwest Egg Sales, Inc.,* 69 Wn.2d 72, 76, 416 P.2d 687 (1966). Similarly, "[s]tatutes pertaining to the same subject matter must be harmonized, if possible." *Snohomish Cy. PUD 1 v. Broadview Television Co.,* 91 Wn.2d 3, 8, 586 P.2d 851 (1978).

Applying these principles to the case at hand, we believe the obvious purpose behind allowing members to advance funds to an agency is to provide the agency with another method of acquiring capital for construction, operation, betterment and maintenance of facilities needed to generate power. The only other method available for acquiring funds is the use of revenue bonds. In granting agencies the authority to issue revenue bonds, the Legislature specifically made laws relating to revenue bonds of public utilities applicable to revenue bonds issued by joint operating agencies. These laws include the power to establish special funds. When the Legislature granted agencies the authority to receive loans from its members, it once again reemphasized the applicability of laws relating to public utility districts. Such laws, as noted above, include the power to establish special funds. We believe a coordinated and harmonious reading of the aforementioned statutory scheme dictates the conclusion that whenever a joint

operating agency issues revenue bonds or receives advances from its members, it may make such debt payable from a special fund.

Such a reading of the statute is supported by the statute's prohibition against issuing general obligation bonds. The obligation of a municipality to pay general obligation bonds is unlimited. The municipality's faith and credit is pledged for the payment of these bonds and taxes may be levied for such payment. On the other hand, the principal and interest on revenue bonds are not payable from the general funds of the municipality. Likewise, they do not constitute a legal or equitable pledge, charge, lien, or encumbrance upon any of the property of the municipality, or upon any of its income, receipts or revenues, except the revenues, agreements and funds pledged under the resolutions and agreements securing the bonds. The prohibition against issuing general obligation bonds applies to the agency's authority to receive loans from its members. *See* RCW 43.52.391. The agency's obligation to repay such loans cannot be unlimited. Hence, it is appropriate to conclude that in receiving loans from its members an agency must be given the power to establish special funds for the sole purpose of paying the loans, thus preventing the obligation from being a general obligation.

## B
### Interpretation of the Agreements

Our conclusion that operating agencies may establish special funds for the sole purpose of repaying advances made by its members does not end our inquiry into the proper form of judgment. Next we must determine whether a special fund was in fact created and if so what revenues, agreements, or funds were pledged to such special fund. The Participants argue that the loan agreements failed to limit repayment to a special fund. Rather, repayment was irrevocable and was to come from any available source. WPPSS argues, however, that the agreements did establish a special fund for repayment of the loans and since there is

no money in the special fund, WPPSS cannot be compelled to repay the loans.

Determination of what funds were pledged to repay the loans requires an examination of the documents involved. When WPPSS decided it was necessary to mothball and later terminate WNP 4 and 5, it adopted resolutions authorizing the execution of loan agreements and issuance of subordinated revenue notes. Thereafter, the Participants executed "Participants Agreements to Advance Funds" and WPPSS issued subordinated revenue notes. Although the documents differed slightly in each transaction, the language pertinent to resolution of this case is the same throughout.

Resolution 1199 contains two provisions specifically relevant to the issue at hand.

Section 3. Note Retirement Fund. There is hereby created a special fund of the System to be known as "Washington Public Power Supply System Nuclear Projects Nos. 4 and 5 Subordinated Revenue Notes Retirement Fund (the "Note Retirement Fund"). The Note Retirement Fund shall be held in trust and administered by the System and *shall be used solely for the purpose of paying the principal of and interest on the Notes.* The System pledges, obligates and binds itself irrevocably to set aside and to pay on or before the 25th day of June, 1984, *to the extent not provided from any other available sources,* out of the revenues, income, receipts, profits and other moneys theretofore paid into the Revenue Fund (as defined in the Bond Resolution) including the revenues received by the System pursuant to the Participants' Agreements, into the Note Retirement Fund, an amount equal to the principal of and interest on the Notes falling due on July 1, 1984.

Section 4. Charge of Notes Against Note Retirement Fund. The Notes and the interest thereon shall be a valid claim of the holder thereof only against the Note Retirement Fund and against the amount of the revenues, income, receipts, profits, and other moneys pledged to the Note Retirement Fund pursuant to Section 3 hereof, and shall constitute a prior charge over all other charges or claims whatsoever against the Note Retirement Fund

and such revenues, income, receipts, profits and other moneys pledged thereto. Such charge on the revenues, income, receipts and profits and other moneys, but not on the amounts held in the Note Retirement Fund, is subject and subordinate to the payments required by the Bond Resolution to be made to the Bond Fund created thereby and to the expenses of operating and maintaining the Projects including amounts owed to the Bond Fund Trustee or others under the Bond Resolution as contemplated thereby. The Board hereby finds and determines that in creating the Note Retirement Fund, due regard has been given to the cost of the operation and maintenance of the Projects, the amounts of the revenues pledged to the aforesaid Bond Fund, and amounts required for the payment of taxes, assessments, or other governmental charges, or payments in lieu thereof, lawfully imposed against the properties or revenues of the Projects payable by the System, and that it has not obligated the System to set aside into the Note Retirement Fund a greater amount of the revenues and proceeds of the Projects, including revenues to be derived by the System pursuant to the Participants' Agreements, than in its judgment will be available over and above such cost of maintenance and operation and taxes, assessments, or other governmental charges or payments in lieu thereof, and the amounts of the revenues previously pledged to the aforesaid Bond Fund.

(Italics ours.)

In addition, the subordinated revenue notes provide in part:

This Note is one of an issue of notes of similar terms (except as to interest rate) issued pursuant to the Note Resolution. Principal of and interest on this Note and the other notes of the issue of which it is one *is payable solely out of the special fund of the System known as the "Washington Public Power Supply System Nuclear Projects Nos. 4 and 5 Subordinated Revenue Note Retirement Fund"* (hereinafter referred to as the "Note Fund") created by the Note Resolution, in which the System has covenanted to deposit from revenues on deposit in the Revenue Fund (as defined in the Note Resolution) amounts sufficient to pay the principal of and interest on this Note and the issue of which it is a

part as the same becomes due, such payment of principal of and interest on this Note being subordinate to the payment of certain other debts and expenses of the System as provided in the Note Resolution.

(Italics ours.) Finally, the Participants Agreement to Advance Termination Costs provides in part: "The Notes shall be payable solely from amounts held in the 1982 Note Retirement Fund".

A careful review of the key provisions outlined above discloses several ambiguities. Pursuant to the notes, WPPSS was obligated to repay the loans solely out of a special fund. The resolutions likewise obligated WPPSS to establish a special fund for the sole purpose of repaying the loans. Yet WPPSS' obligation to repay the loans out of a special fund arose only to the extent that repayment did not come from any other available sources. "Any other available sources" could mean "any other fund". Furthermore, WPPSS' obligation to place money into the Note Retirement Funds was irrevocable, thus suggesting the obligation went beyond those funds actually placed into the special Note Retirement Funds.

To ascertain the meaning of unclear and ambiguous language in a contract, each provision must be read in pari materia with the whole contract and in light of all of the circumstances surrounding it. If it remains unclear, resort must be had to extrinsic interpretative aids, including the conduct of the parties under it. *Henry v. Lind,* 76 Wn.2d 199, 201, 455 P.2d 927 (1969). Language in the documents will be given its ordinary meaning and that which best gives effect to the intentions of the parties. *Patterson v. Bixby,* 58 Wn.2d 454, 458, 364 P.2d 10 (1961). An interpretation which gives a reasonable, fair, just and effective meaning to all manifestations of intention is preferred to an interpretation which leaves a part of such manifestations unreasonable, imprudent or meaningless. *Dickson v. United States Fid. & Guar. Co.,* 77 Wn.2d 785, 790, 466 P.2d 515 (1970); *see also Newsom v. Miller,* 42 Wn.2d 727, 731, 258 P.2d 812 (1953).

With these rules in mind, we find that the language of sections 3 and 4 of the note resolutions, and the cited language from the revenue notes and "Participants Agreement to Advance Termination Costs" established a special fund for repayment of the loans. Viewing all the documents as a whole, we believe the parties intended to use the Note Retirement Funds as the sole source of repayment. Any other reading of the documents would render the language "there is hereby created a special fund" and "payable solely out of a special fund" meaningless. Furthermore, our reading of the documents is consistent with the applicable statutes. RCW 43.52.391 prohibited WPPSS from incurring a general obligation. If repayment was not limited to the Note Retirement Funds, the loans could constitute a general obligation in violation of the statute.

In addition to creating a special fund, we believe the parties intended to limit the funds pledged to the Note Retirement Funds. Pursuant to section 3 of the note resolutions, WPPSS pledged, "to the extent not provided from any other *available* sources" (italics ours), to repay the loans from money paid into the revenue fund. Although the lenders vehemently argue that this language demonstrates repayment was to come from any WPPSS fund, we believe the term "other available sources" merely contemplated the possibility that other sources might become available. For instance, other funds might become available if additional notes were issued pursuant to section 7 of the note resolutions. Such a reading of the documents is consistent with the rule that reasonable constructions are preferred over unreasonable and imprudent constructions. The lenders' interpretation would give them priority on all WPPSS funds. This is contrary to the provisions in the note resolutions which make it clear that repayment of the loans was subordinate to the payments to be made to the bondholders. The lenders' interpretation is likewise inconsistent with the provision in the notes wherein WPPSS promised to "deposit from revenues on deposit in the Revenue Fund . . . amounts sufficient to pay the principal of and interest

on" the notes. The notes fail to mention any other fund. In light of the subordinate position occupied by the lenders and the fact that the notes do not require repayment from other sources, it is more reasonable to interpret section 3 of the note resolutions as (1) allowing WPPSS to repay the loans, if possible, from other sources which might become available and which were not otherwise obligated; but (2) requiring repayment to flow from the revenue fund into the Note Retirement Funds if these other sources did not become available.

Having decided that "other available sources" means funds which might become available and are not otherwise obligated to other debts, there remains the question whether the revenues pledged to the Note Retirement Funds included revenues from projects other than WNP 4 and 5. To resolve this question, we turn again to the language of the documents. The note resolutions provide:

> Section 2. Authorization of Notes. There is hereby created and established an issue of subordinated revenue notes of the System to be known as the "Nuclear Projects Nos. 4 and 5 Subordinated Revenue Notes" (the "Notes"), which Notes may be issued from time to time pursuant to the terms, conditions and limitations of this Resolution to evidence advances made pursuant to the Agreements.
>
> . . .
> Section 8. Payment of Principal of and Interest on Notes. The System will duly and punctually pay or cause to be paid, but only from the revenues of the Projects and moneys pledged hereunder to the Note Retirement Fund . . .

In addition to these provisions, the documents consistently characterize the loan notes as "Nuclear Projects Nos. 4 and 5 Subordinated Revenue Notes". Viewing the documents as a whole, we believe the parties intended to limit the pledge to revenues of WNP 4 and 5.

Not only is this conclusion consistent with our interpretation of the term "other available sources", but also with the overall statutory scheme regulating joint operating

agencies. Pursuant to RCW 43.52.360, any two or more cities or PUD's may form an operating agency. Application for the formation of an operating agency shall be made to the director of the Department of Ecology. Such application must set forth the general description of the project to be constructed and a statement of the proposed method of financing the project. No operating agency may undertake projects in addition to those for which it was formed without the approval of a majority of its members. In addition, pursuant to RCW 43.52.3411, WPPSS is authorized to establish a separate fund for the purpose of defraying the costs of each plant and to issue and sell revenue bonds payable only out of the revenues of each plant. These statutes make it clear that each time a new project is started it is constructed as a separate system and projects begun before and after do not constitute a part of the new project. In accordance with these statutes, we hold that the bridge and termination loans are repayable only from WNP 4 and 5. Any other holding would allow revenues and proceeds to be syphoned off for purposes unrelated to the project for which the bonds were issued.

 Thus far we have concluded that a special fund was established and WPPSS pledged to this special fund revenues not otherwise committed to other obligations. The general rule is that a mere agreement to pay a debt out of a designated fund does not operate as a legal or equitable assignment. However, when there is shown a clear intent to assign the money, a lien is created on the funds. *See Modern Kitchens of Syracuse, Inc. v. Damiano,* 51 Misc. 2d 264, 273 N.Y.S.2d 151 (1966); *Miller v. Wells Fargo Bank Int'l Corp.,* 540 F.2d 548 (2d Cir. 1976); *see also Hitt Fireworks Co. v. Scandinavian Am. Bank,* 114 Wash. 167, 195 P. 13, 196 P. 629 (1921). Section 4 of resolution 1199 provides in relevant part:

The pledge hereby made by the System shall be valid and binding from the time of the adoption of this Resolution. The revenues, income, receipts, profits and other moneys so pledged under this Resolution, and hereafter

received by the System shall immediately be subject to the lien of such pledge without any physical delivery or further act, and, subject to the provisions of this Resolution, the lien of the aforesaid pledge shall be valid and binding as against any party having claims of any kind in tort, contract or otherwise against the System irrespective of whether such parties have notice of the foregoing pledge.

Clearly this provision constitutes an equitable assignment and obligates WPPSS to repay the loans from money pledged to the Note Retirement Funds despite the fact that the retirement funds contain no money.

In summary, we hold that RCW 43.52.391 authorized WPPSS to create a special fund for the sole purpose of repaying the bridge and termination loans. This authority was exercised by WPPSS when it established the Note Retirement Funds. In setting up the Note Retirement Funds, WPPSS pledged all revenues of WNP 4 and 5 that might become available, and were not otherwise obligated, to repayment of the loans. In addition, the participants were given a lien on this pledge, thus mandating repayment from the pledged money despite the failure of WPPSS to actually place money in the funds. Hence, the trial courts' orders authorizing repayment to go beyond WNP 4 and 5 are reversed and judgment is modified obligating WPPSS to repay loans from both nonmember and member lenders from "available" funds of WNP 4 and 5.

## -III
### CONVERSION

Following entry of judgment against WPPSS, the Lewis County Superior Court Judge entered judgment in favor of WPUG against Chemical Bank for conversion. Chemical Bank argues there was no conversion because the lenders had no right to the funds transferred to Chemical Bank and in fact the Bank was entitled to the funds pursuant to the Bond Resolution.

As a preliminary matter, we note that in opposition to the summary judgment, Chemical Bank asserted several

jurisdictional CR 54(b) and constitutional defenses. In addition, Chemical Bank argued that the bridge lenders had no cause of action because their loans had not matured and there was no anticipatory breach. Our resolution of the conversion issue makes it unnecessary to decide these issues.

■■ A conversion is the act of willfully interfering with any chattel, without lawful justification, whereby any person entitled thereto is deprived of the possession of it. *Judkins v. Sadler–Mac Neil,* 61 Wn.2d 1, 3, 376 P.2d 837 (1962). Money, under certain circumstances, may become the subject of conversion. However, there can be no conversion of money unless it was wrongfully received by the party charged with conversion, or unless such party was under obligation to return the specific money to the party claiming it. *Davin v. Dowling,* 146 Wash. 137, 262 P. 123 (1927); *Seekamp v. Small,* 39 Wn.2d 578, 237 P.2d 489 (1951); Annot., *Nature of Property or Rights Other Than Tangible Chattels Which May Be Subject of Conversion,* 44 A.L.R.2d 927 (1955).

Tested by this rule, it is apparent that the evidence in this case was insufficient to establish an action for conversion. The injunction imposed against Chemical Bank was lifted on July 22, 1983, at which time WPPSS declared its inability to pay its debts as they became due. Under section 11.1(2)[6] of the Bond Resolution, this admission constituted an event of default. Subsequently, on July 25, 1983, WPPSS paid over to Chemical Bank all WNP 4 and 5 moneys, securities, and funds then held by WPPSS. Clearly, the transfer to Chemical Bank was not wrongful. On the contrary, Chemical Bank had every right to receive the remaining WNP 4 and 5 funds, following default, under

---

[6]Section 11.1(2) provides:

"Default shall be made in the due and punctual payment of the principal of and premium, if any, and interest on any of the Bonds when the same shall become due and payable, either at maturity or by proceedings for redemption or otherwise . . ."

section 11.3 of the Bond Resolution.[7] Furthermore, although RCW 43.52.391 mandates repayment, it fails to give members of WPPSS any priority on WPPSS funds. Without any such priority in the statute or other prohibitory provision in the bankruptcy laws, a debtor, though insolvent, may in good faith prefer one or more creditors over all other creditors, even to the extent of exhausting his assets. *Manello v. Bornstine*, 44 Wn.2d 769, 270 P.2d 1059, 45 A.L.R.2d 494 (1954); Annot., *Rights as Between Creditors of Fraudulent Grantor, Where One or More of Them, in Payment of or as Security for His Debt, Receives Deed or Mortgage From Fraudulent Grantee*, 114 A.L.R. 406 (1938). There is no evidence of bad faith. Hence, the transfer was not wrongful.

Second, the lenders have failed to show they had a right to the specific funds transferred. Rather, all of the pertinent documents indicate that on July 25, 1983, Chemical Bank had a right to the transferred funds. To begin with, resolution 1199 authorizes WPPSS to issue notes

> which are a charge upon all or any portion of the revenues of the Projects *junior* or inferior to the payments to be made into the Bond Fund . . .

(Italics ours.) Resolution 1199 also states that the note holders shall have a prior charge over all other charges or claims whatsoever against the Note Retirement Fund and such revenues, income, receipts, profits and other moneys pledged thereto.

> Such charge on the revenues, income, receipts and profits and other moneys, but not on the amounts held in the Note Retirement Fund, is *subject* and *subordinate* to the *payments required by the Bond Resolution to be made to the Bond Fund created thereby and to the expenses of operating and maintaining the Projects including amounts owed to the Bond Fund Trustee or others under the Bond Resolution as contemplated thereby.*

Section 9.6 of the Bond Resolution provides in relevant part:

---

[7]See footnote 3.

> The System will not hereafter create any other special fund or funds for the payment of revenue bonds, warrants or other obligations or issue any bonds, warrants or other evidences of indebtedness payable out of or secured by a pledge of the revenues or properties of the Projects, or create any additional indebtedness, which will rank on a parity with or in priority over the charge and lien on such revenues or properties for the payments into the Bond Fund . . .
>
> . . .
>
> Nothing herein contained shall prevent the System from issuing revenue bonds, notes, warrants or other evidences of indebtedness which are a charge upon all or any portion of the revenues of the Projects junior or inferior to the payments to be made into the Bond Fund and the bond funds created for additional bonds issued pursuant to this Resolution.

The Bond Resolution also provides that "[i]nterest accruing on the Bonds to July 1, 1988, which is not payable from deposits from the Revenue Fund to the Bond Fund" is a cost of construction and payable out of the construction fund. Bond Resolution § 6.9(F). Furthermore, any surplus in the construction fund must be credited to the bond fund to pay the interest on the bonds before it is used to pay other debts. Bond Resolution § 6.11.

We conclude the aforementioned provisions indicate the parties intended to give the bondholders priority on the funds held in the construction fund. Although the lenders had a lien on funds pledged to the Note Retirement Funds, such lien was subordinate to the rights of the bondholders. The bondholders' superior position gave them a right to the funds held in the construction fund. Only after the debts owed to the bondholders were fulfilled could the lenders seek repayment via the construction fund.

Our conclusion is in no way contrary to the decisions in *Chemical Bank* I and II. WPUG argues that *Chemical Bank* I and II invalidated the Bond Resolution. WPUG's argument stems from the following language contained in *Chemical Bank* I:

We are asked to decide whether the Participants' Agreement and the Bond Resolution, hereinafter referred to as the agreement, were contracts within the statutory authority of the Washington participants. While the participants are not direct parties to the Bond Resolution, the Participants' Agreement, § 25, provides that WPPSS must comply with the Bond Resolution and the Participants' Agreement is subject to the terms of the Bond Resolution.

(Footnote omitted.) *Chemical Bank* I, at 781–82. In *Chemical Bank* I, this court held that the Participants lacked substantive authority to enter into a contract which required the Participants to guarantee bond payments, irrespective of whether the plant was ever completed. *Chemical Bank* I, at 798. In reaching this conclusion, the court did not address the complete validity of the Bond Resolution. Rather, the only provisions of the Bond Resolution that arguably were invalidated were those sections which related to the enforcement of the Participants' Agreements. In the instant case, the pertinent provisions of the Bond Resolution are those which give the bondholders a superior claim to WPPSS funds vis–a–vis certain lenders. Based on these distinctions, WPUG's argument that the Bond Resolution is invalid clearly lacks merit.

In conclusion, we hold the bondholders had priority on the remaining WNP 4 and 5 funds and the transfer was not wrongful. Therefore, there was no conversion.

## IV
### REMAINING CLAIMS

Having resolved the primary issues involved in the instant case, additional issues bear mentioning. Chemical Bank argues that the trial court should have granted its affidavits of prejudice and that the trial court's denial of such affidavits violated the Bank's due process rights. Our reversal of the conversion claim renders any prejudice from this alleged error harmless.

Similarly, although the intervenors' interests were probably sufficient to merit intervention, the decision of the trial

judge to disallow intervention likewise is harmless error since there was no conversion.

Finally, attorney fees have been requested pursuant to the contracts. We remand to the trial courts for a determination of such fees and for modification of the respective judgments consistent with this opinion.

DOLLIVER, C.J., UTTER, BRACHTENBACH, ANDERSEN, and DURHAM, JJ., and HAMILTON, J. Pro Tem., concur.

DORE, J. (concurring in part, dissenting in part)—I concur in the majority's holding that the trial courts did not err in entering summary judgments against the Washington Public Power Supply System (Supply System) and ordering the bridge and termination loans immediately due and payable.

I dissent to the majority's limitation of the form of judgment to "special fund" revenues of Washington nuclear plants (WNP) 4 and 5. I would hold that pursuant to RCW 43.52.391 and language of the loan agreements all member lenders are entitled to repayment of the loans out of the proceeds of revenue bonds, operating revenue, or any other funds of the Supply System including those of WNP 1, 2 and 3.

## RCW 43.52.391

The primary statute involved here is RCW 43.52.391 which provides in pertinent part:

> Any member of an operating agency *may advance* or contribute funds to an agency *as may be agreed upon* by the agency and the member, *and the agency shall repay such advances or contributions from proceeds of revenue bonds, from operating revenues or from any other funds of the agency,* together with interest not to exceed the maximum specified in RCW 43.52.395(1). The legislative body of any member may authorize and make such advances or contributions to an operating agency to assist in a plan for termination of a project or projects, whether or not such member is a participant in such project or projects. Any member who makes such

advances or contributions for terminating a project or projects in which it is not a participant shall not assume any liability for any debts or obligations related to the terminated project or projects on account of such advance or contribution.

(Italics mine.)

This statute is part of RCW 43.52 which in 1957 authorized the creation of operating agencies "for the purpose of acquiring, constructing, operating and owning plants, systems and other facilities and extensions thereof, for the generation and/or transmission of electric energy and power." RCW 43.52.360. When the Legislature authorized the creation of operating agencies it granted such agencies two separate and distinct methods of acquiring working capital. RCW 43.52.391 delineates one of these methods. Members of the Supply System are authorized to "advance or contribute funds to an agency" particularly "to assist in a plan for termination of a project or projects, whether or not such member is a participant in such project or projects." RCW 43.52.391. That statute provides the authority for members of the Supply System to make the bridge and termination loans. And, that statute provides that the Supply System "shall repay such advances or contributions from proceeds of revenue bonds, from operating revenues or from any other funds of the agency, together with interest not to exceed the maximum specified in RCW 43.52-.395(1)."

The statutory language is unequivocal. In RCW 43.52.391 the Legislature authorized members of the Supply System to make discretionary advances to the System. It further specified the sources from which the Supply System shall repay the advances. It imperatively states that the advances shall be repaid "from proceeds of revenue bonds, from operating revenues or from any other funds of the agency . . ." RCW 43.52.391.

In accord with the rule that words in a statute must be given their usual and ordinary meaning, use of the word "shall" is imperative and operates to create a duty. The

presumption which follows the use of the word "shall" is strengthened when "a provision contains both the words 'shall' and 'may,'" the court further presuming "that the lawmaker intended to distinguish between them, 'shall' being construed as mandatory and 'may' as permissive." *Scannell v. Seattle,* 97 Wn.2d 701, 704, 648 P.2d 435, 656 P.2d 1083 (1982).

The majority's contention that the directive "shall" simply mandates repayment and is not a directive of repayment from a specific source of funds is unavailing. If the Legislature did not mean to mandate repayment from "any funds of the agency," then why name such funds as a source of repayment. Certainly, the discretionary advances and contributions authorized by the first clause would presumably include a requirement of repayment. Had the Legislature wished to grant the parties the option of repayment from restricted funds, it could have merely indicated that the agency shall repay such advances as agreed. It did not leave that vacuum or ambiguity. It specified in mandatory language that such advances "shall" be repaid "from proceeds of revenue bonds, from operating revenues *or from any other funds of the agency . . .*" (Italics mine.)

The majority's attempt to create an ambiguity through the use of additional language in RCW 43.52.391 is also unfounded. Although it is true that public utility districts have the authority to establish special funds and the Supply System has been granted most of the powers granted public utilities, it does not follow that the Supply System has the authority to establish a special fund for repayment of contributions or advances from its members. RCW 43.52.391 specifically states that *"[e]xcept as otherwise provided in this section,* a joint operating agency shall have all powers now or hereafter granted public utility districts under the laws of this state" (italics mine). The power to establish special funds for repayment of advances is otherwise provided for in this section by the directive that they be repaid from the listed sources including any funds of the agency. Thus, the Supply System is exempted from public

utility district authority to establish a special fund for repayment of member advances and contributions. No ambiguity exists between these provisions.

The majority additionally relies on the language of RCW 43.52.391 prohibiting the issuance of general obligation bonds. Again, I see no inconsistency. The repayment of advances or contributions from any funds of the agency is not violative of this prohibition. General obligation bonds are those backed by a pledge of the taxing power of the issuing governmental entity. Such bonds are payable from an unlimited general ad valorem tax on all taxable property within the confines of the governmental entity. *See* 15 E. McQuillin, *Municipal Corporations* § 43.05 (3d rev. ed. 1985); R. Lamb & S. Rappaport, *Municipal Bonds* 9–10, 99 (1980). The repayment provisions relating to advances and contributions do not fall within the definition of general obligation bonds. Repayment is confined to the available funds of the Supply System and the System is without the authority to levy taxes for the repayment of these obligations.

The majority's holding is further weakened by the distinctions the Legislature created in the only other method of acquiring working capital. The Supply System has the authority to issue "revenue bonds or warrants payable from the revenues of the utility properties operated by it." RCW 43.52.3411. "Revenue bonds or warrants" is defined to mean "bonds, notes, bond anticipation notes, warrants, certificates of indebtedness, commercial paper, refunding or renewal obligations, *payable from a special fund* or revenues of the utility properties operated by the joint operating agency." (Italics mine.) RCW 43.52.250. When the Supply System issues revenue bonds or warrants, it must follow the procedures set forth in RCW 43.52.3411, which include "all the provisions of law as now or hereafter in effect relating to revenue bonds or warrants of public utility districts . . ."

In contrast, the Legislature made no reference to repayment from a special fund in enacting the provisions relating

to contributions or advances from members of an operating agency. The Legislature instead stated that "the agency shall repay such advances or contributions from proceeds of revenue bonds, from operating revenues or from any other funds of the agency . . ." RCW 43.52.391.

The Legislature has made an express distinction between "revenue bonds or warrants" authorized pursuant to RCW 43.52.3411 and "advance[d] funds" authorized pursuant to RCW 43.52.391. The former are "payable from the revenues of the utility properties operated by it"; the latter are payable "from proceeds of revenue bonds, from operating revenues or from any other funds of the agency . . ." This court is not permitted to remove this distinction nor add language to the legislative scheme which is clearly expressed.

I would therefore hold as a matter of law that the termination and bridge loans constitute obligations payable from proceeds of revenue bonds, from operating revenues, or from any other funds of the agency and are not subject to a special fund.

### LENDING AGREEMENTS

Contrary to the majority's assertion, I find no ambiguity in the lending agreements and resolutions which support an interpretation that the revenues of WNP 4 and 5 are the sole source of funds pledged to repay advances and contributions. Even if the majority's construction of the agreements was plausible, the provisions of the resolutions and loan agreements which contravene the express mandate of RCW 43.52.391 would be void and unenforceable.

As a preliminary matter, it is important to outline the documents involved in each transaction. The Supply System received bridge loans in October and December of 1981. The termination loans were made in January and March of 1982. Each loan involved the following documents: (1) a resolution adopted by the Supply System authorizing the issuance of subordinated revenue notes; (2) a participants' agreement to advance costs; (3) a subordinated revenue note; and (4) an escrow agreement. All the

resolutions, agreements, and notes contained basically the same language. The following language contained in the documents outlined above is relevant to the issue here.

The loan agreement notes state that they are "payable solely out of the special fund of the System known as [name of fund stated]." The notes further state in substantially identical terms:

Reference is hereby made to the Note Resolution, Agreement and Escrow Agreement, copies of which are on file in the principal office of the System, and to all of the provisions (other than findings or determinations made by the System in the Note Resolution) of which the registered owner of this Note by its acceptance hereof hereby assents, *for* definitions of terms; the description of and nature and extent of the security for this Note; *the moneys from which the principal of and interest on this Note are payable*; the terms and conditions under which the System may issue additional bonds, notes or other evidences of indebtedness payable prior to or on a parity herewith; the rights and remedies of the holder hereof with respect hereto and thereto; and the rights, duties and obligations of the System hereunder.

(Italics mine.)

The operative language which created the special funds and which identified the assets pledged thereto is contained in section 3 of resolutions 1199 and 1204. Both resolutions are substantially identical with the exception of the dates stated therein. Resolution 1204 provides:

Section 3. Note Retirement Fund. There is hereby created a special fund of the System to be known as "Washington Public Power Supply System Nuclear Projects Nos. 4 and 5 Subordinated Revenue Notes Retirement Fund". The 1982 Note Retirement Fund shall be held in trust and administered by the System and shall be used solely for the purpose of paying the principal of and interest on the Notes. The System pledges, obligates and binds itself irrevocably to set aside and to pay on or before the 29th day of June, 1983, *to the extent not provided from any other available sources,* out of the *revenues, income, receipts, profits and other moneys,* including but not limited to amounts received under the

Participants' Agreements, theretofore paid into the Revenue Fund, an amount equal to the principal of and interest on the Notes falling due on June 30, 1983.

(Italics mine.)

Under this plain and unambiguous language, the Supply System irrevocably pledged itself to set aside an amount equal to the principal of and interest on the loan agreement notes. This pledge expressly applied not only to "revenues, income, receipts, profits and other moneys, including but not limited to amounts received under the Participants' Agreements," but also to "other available sources." Resolution 1204, § 3. This language identified the assets pledged to the fund. The Supply System's undertaking in the plain language of both the resolutions and notes is consistent with the Supply System's statutory obligations to repay advances and contributions "from proceeds of revenue bonds, from operating revenues or from any other funds . . ." of the Supply System. RCW 43.52.391.

Looking at the loan agreement resolutions, it is clear that two sources of repayment are specified. The first source is "other available sources." The secondary source is "revenues, incomes, receipts, profits and other moneys, . . . theretofore paid into the Revenue Fund . . ." The intent is clear that the words "other available sources" mean something other than the enumerated sources paid into the revenue fund. The words "other available sources" are used as an exception. They encompass "proceeds of revenue bonds" and "any other funds" as required by RCW 43.52.391. The specifically named sources clearly connote items which are "operating revenues," the third source specified in the statute.

The mandatory repayment language receives additional support from section 4 of the note resolution which provides:

The pledge hereby made by the System shall be valid and binding from the time of the adoption of this Resolution. The revenues, income, receipts, profits and other money so pledged under this Resolution, and hereafter

received by the System, shall immediately be subject to the lien of such pledge without any physical delivery or further act, and, subject to the provisions of this Resolution, the lien of the aforesaid pledge shall be valid and binding as against any party having claims of any kind in tort, contract or otherwise against the System irrespective of whether such parties have notice of the foregoing pledge.

This provision gave the lenders an equitable lien on the revenues, income, receipts, profits and other moneys that the Supply System irrevocably pledged to the note retirement funds.

There is absolutely no indication that repayment is intended to be limited to funds of a specific project (*i.e.,* WNP 4 and 5). RCW 43.52.391 mandates repayment from "funds of the agency" not revenues of a specified project. The lending agreements, although delineating the repayment funds as "Projects Nos. 4 and 5 Subordinated Revenue Notes Retirement Fund", also do not limit the source of repayment funds to a particular project. The language consists of an obligation by the "System" to pay from "available sources" and if not available, out of "revenues, income, receipts, profits and other moneys".

The loan documents themselves explicitly incorporate existing statutory law. Section 11 of resolution 1199 and 1204 provides:

Resolution and Laws a Contract with Noteholders. This Resolution is adopted under the authority of and in full compliance with the Constitution and laws of the State of Washington, including *Titles 43 and 54 of the Revised Code of Washington,* as amended and supplemented. In consideration of the purchase and acceptance of the Notes by those who shall hold the same from time to time, *the provisions of this Resolution and of said laws shall constitute a contract with the holder or holders of each Note,* and the obligations of the system under said laws and under this Resolution shall be enforceable by any court of competent jurisdiction.

(Italics mine.) The absolute repayment duty created by RCW 43.52.391, unrestricted as to repayment source,

therefore, was agreed upon by the parties. The loan instruments reflect no limitation on the source of repayment funding to WNP 4 and 5.

The thrust of the majority's limitation of the repayment source to the revenues of WNP 4 and 5 is the avoidance of creating a lender's priority on all Supply System funds. We are not, however, concerned with priorities. RCW 43.52.391 does not create priorities but merely mandates repayment from any funds of the Supply System. The nature of "any other fund" or "other available sources" cannot be determined at this time. The lenders will have to seek to execute on their judgments, limited as they may be to funds not subject to prior or superior claims, through the procedure for collection of judgments against municipal corporations provided by RCW 6.04.140 and .150. The Supply System has a plethora of creditors such as contractors, bondholders, and judgment creditors, including the lenders in this action. The priority of creditors vis–a–vis one another must be determined in litigation in which all necessary parties are present. The question as to the existence of prior claims against the particular funds sought by these lenders and thus the funds' availability to satisfy the judgments, can be resolved at the time of those collection efforts.

### CONVERSION

I concur with the majority's determination that no conversion occurred in the July 25 transfer of WNP 4 and 5 construction fund moneys to Chemical Bank. I do so, however, under differing analysis. Although RCW 43.52.391 mandates repayment from any funds of the Supply System, it does not address priorities as to the available funds. To determine entitlement to the construction fund moneys, we must examine the contractual agreements among the parties. Resolution 1199 provides that the note holders (lenders) shall have a prior charge over all other charges against the moneys pledged for repayment of the notes, and the bond fund has superiority on all funds required to be paid to the bond fund.

Such charge on the revenues, income, receipts and profits and other moneys, but not on the amounts held in the Note Retirement Fund, is subject and subordinate to the payments required by the Bond Resolution to be made to the Bond Fund created thereby and to the expenses of operating and maintaining the Projects including amounts owed to the Bond Fund Trustee or others under the Bond Resolution as contemplated thereby.

The construction fund moneys were specifically pledged to the bond fund. The Bond Resolution provides that "[i]nterest accruing on the Bonds to July 1, 1988, which is not payable from deposits from the Revenue Fund to the Bond Fund" is a cost of construction and payable out of the construction fund. Bond Resolution § 6.9(F). Furthermore, any surplus in the construction fund must be credited to the bond fund to pay the interest on the bonds before it is used to pay other debts. Bond Resolution § 6.11.

Thus, the lenders have no valid claim to the construction fund moneys of WNP 4 and 5 as "any funds of the agency" due to the bondholders' superior position in regard to construction fund moneys.

### CONCLUSION

It is error to limit collection of summary judgments approved herein to assets of WNP 4 and 5; restrictive language in such judgments exonerating WNP 1, 2 and 3 from any and all liability is without legal basis. I cannot condone the majority's creation of ambiguity upon ambiguity to reach a desired result. The governing statute and corresponding agreements between the parties mandate that the loans be repaid from the proceeds of revenue bonds, operating revenue, or *any other funds of the Supply System.* The appropriate resolution of this action could not be more evident.

GOODLOE, J., concurs with DORE, J.

After modification, further reconsideration denied February 11, 1986.