[No. 27401-5-I.   Division One.   September 23, 1991.]

RONALD W. SCOTT, ET AL, *Appellants*, v. ELMER J. PETETT,
ET AL, *Respondents*.

*Rhys Sterling* and *Halinen & Associates,* for appellants.

*Blair B. Burroughs* and *Mills & Cogan,* for respondent Petett.

*David S. Grossman* and *Keller Rohrback,* for respondent Northwest Corporate Real Estate.

SCHOLFIELD, J. — Ronald and Annette Scott (Scott) appeal from orders granting summary judgment in favor of the

defendants Elmer and Edith Petett (Petett) and Northwest Corporate Real Estate, Inc. (Northwest). We affirm.

FACTS

Petett owned approximately 9 acres of vacant land in Algona, Washington. On May 5, 1987, Petett entered into an exclusive listing agreement for sale of the property with Northwest. Petett dealt with Steven Harris, the president and designated broker for Northwest. The listing agreement provided that the property was "vacant" and that its topography was "flat". The agreement further stated that the property was suitable for "industrial [buildings]" and that it "need[ed] rezoning". There is no evidence that Scott ever saw or relied upon the terms of the exclusive listing agreement.

A "for sale" sign was placed on the property, and Scott contacted Harris, advising him that he was interested in purchasing the property as a site on which to locate his road construction business and that he wanted to use the property for truck storage, an office, and a shop. Harris' affidavit of April 13, 1990, asserts that he "specifically advised Mr. Scott that the property was zoned for residential use and that the use he contemplated would require that the property be rezoned." Scott does not deny this assertion.

Harris and Scott went to the offices of the City of Algona, where the zoning problem was discussed with a representative of the Algona Department of Public Works.

On June 15, 1987, Scott signed a real estate purchase and sale agreement for the purchase of the Algona property. The agreement was subject to the following clause:

This sale is subject to and contingent upon the Purchaser receiving such soils analysis, engineering reports, zoning, and or other feasibility studies as Purchaser shall, in his sole discretion, deem necessary to assure Purchaser of the physical and practical feasibility of using the subject real property for industrial development. It is understood that the subject property is to be rezoned to M-1, Light Industrial, City of Algona, during this contingency period and that Purchaser agrees to apply for said rezone immediately during this contingency

period. Purchaser and Seller agree to pay any costs involved in the rezone on a 50%-50% basis.

This contingency clause also required the purchaser to give notice to the seller of the removal of the conditions within 90 days of the seller's acceptance of the offer. The purchase and sale agreement, including the contingency clause, was presented as an offer to Petett, who accepted it on June 27, 1987, thus making September 27, 1987, the date on which the contingency period would expire.

Harris stated in his affidavit:

> As a service to my principals, Elmer and Edith Petett, I agreed that I would provide whatever assistance I could in connection with the process of rezoning the property from residential to light industrial classification. In that regard, I prepared, with the input and assistance of Elmer and Edith Petett, a SEPA Environmental Checklist, which was submitted to the City of Algona.

Scott's version of this undertaking by Harris was that he voluntarily promised them that during the contingency period, he would undertake and obtain the rezoning of the property. Scott contends that, in reliance upon Harris, he conducted no further studies or investigations on the suitability of the property for its intended use. In connection with the application to the City of Algona, when asked to "[l]ist any government approvals or permits that will be needed for [the] proposal, if known", Harris and Petett replied that "City of Algona building permits will be necessary."

On September 8, 1987, the City of Algona issued a SEPA Determination of Non-Significance (DNS), which provided that the lead agency would take no action on the proposal for 15 days, and requested that all comments be submitted by September 22, 1987. By letter dated September 18, 1987, the Department of Ecology (DOE) wrote Algona Mayor Pro Tempore Sue Langley, stating that the proposed site "contains wetlands which are under the jurisdiction of the U.S. Army Corps of Engineers." The letter further stated that "[a] Section 404 permit may be required for any fill placed within the wetlands on site." When the sale of the Algona

property was completed on October 1, 1987, neither Harris, Scott, nor Petett was aware of possible jurisdiction over the property of the United States Army Corps of Engineers (COE).

By September 18, 1987, the rezone process had not yet been completed. On that date, Scott met with Harris and Petett to discuss the possibility of extending the contingency period so that Harris could complete the rezone of the property. Petett refused to grant an extension and told Scott he would have to take the property "as is". In addition to discussing the progress of the rezone, Scott and Petett discussed the fact that some community members were opposed to the development of the property and that an environmental study might be required to develop the property. At the conclusion of the meeting, Scott waived the contingencies and agreed to proceed with closing of the transaction. The sale ultimately closed on October 1, 1987.

It was not until October 5, 1987, that Scott learned of the possibility that his newly purchased property might contain wetlands under the jurisdiction of COE. On November 11, 1987, Scott wrote COE to request a classification of his property. By letter dated December 22, 1987, COE informed Scott that "most, and possibly all," of his 9-acre tract contained wetlands subject to COE jurisdiction and that the wetlands were considered "isolated wetlands" subject to nationwide permit requirements.

In February 1988, COE advised Scott that an individual Department of the Army permit was required prior to proceeding with a fill on 8 acres of the property. Although permit application materials were enclosed in the notice, Scott never submitted an application for an individual permit to COE, and his file was closed in April 1989. At that time, COE informed Scott that he could still apply for an individual permit at any time. Scott also abandoned efforts to complete the City of Algona's rezone procedures.

Scott contends that all parties to the real estate purchase and sale agreement were mistaken as to a basic assump-

tion: that the City of Algona had sole jurisdiction to authorize the filling of the property. Based on this alleged mutual mistake, Scott brought this suit for rescission of the agreement, or, in the alternative, a reduction in the purchase price. Scott also alleged breach of contract, misrepresentation, and Consumer Protection Act violations. Petett counterclaimed, seeking enforcement of the promissory note and foreclosure of the deed of trust.

Scott moved for summary judgment on the issue of mutual mistake. The trial court denied that motion. On May 29, 1990, the court entered an order granting Northwest's motion for summary judgment and an order granting Petett's motion for summary judgment dismissing Scott's claims and affirmative defenses against Petett. On June 21, 1990, the trial court entered judgment in favor of Petett for money due on the promissory note and for a decree of foreclosure. This appeal followed.

### REVIEW OF SUMMARY JUDGMENT

In reviewing an order of summary judgment, an appellate court engages in the same inquiry as the trial court. *Hansen v. Friend*, 59 Wn. App. 236, 240, 797 P.2d 521 (1990), *review granted*, 116 Wn.2d 1007 (1991). Summary judgment is to be granted only if the record demonstrates that there is no genuine issue as to any fact that is material to the cause of action, and that the moving party is entitled to judgment as a matter of law. *Hansen*, at 240. The court must consider the facts and all reasonable inferences therefrom in a light most favorable to the nonmoving party. *Hansen*, at 240. The motion should be denied if reasonable persons could reach different conclusions. *Hansen*, at 240.

### DECLARATIONS ADMISSIBLE IN SUMMARY JUDGMENT PROCEEDINGS

Scott contends that the five declarations relied upon by Petett before the trial court do not comply with the evidentiary requirements of CR 56 and, thus, are not admissible in evidence. Scott urges that the declarations be stricken, as

they are not competent evidence and, thus, cannot satisfy Petett's initial burden of proof that there are no genuine issues of material fact.

Relevant portions of CR 56(c) provide as follows:

> The motion and any supporting affidavits, memoranda of law, or other documentation shall be filed and served not later than 21 calendar days before the hearing. . . . The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

The use of declarations in lieu of affidavits is authorized by statute:

> Whenever, under any law of this state or under any rule, order, or requirement made under the law of this state, any matter in an official proceeding is required or permitted to be supported, evidenced, established, or proved by a person's sworn written statement, declaration, verification, certificate, oath, or affidavit, the matter may with like force and effect be supported, evidenced, established, or proved in the official proceeding by an unsworn written statement, declaration, verification, or certificate, . . ..

RCW 9A.72.085, in part. Additionally, General Rule 13 provides in part as follows:

> **(a) Unsworn Statement Permitted.** Except as provided in section (b), whenever a matter is required or permitted to be supported or proved by affidavit, the matter may be supported or proved by an unsworn written statement, declaration, verification, or certificate executed in accordance with RCW 9A.72.085. . . .
>
> **(b) Exceptions.** This rule does not apply to writings requiring an acknowledgment, oaths of office, or oaths required to be taken before a special official other than a notary public.

Scott urges that the operation of CR 81 prevents the court from relying on RCW 9A.72.085 or GR 13. CR 81 generally states that unless inconsistent with rules or statutes applicable to special proceedings, the Superior Court Civil Rules govern all civil proceedings. The rule further provides that the civil rules supersede all procedural statutes and other rules that may be in conflict.

■ Court rules and statutes should be harmonized whenever possible, and "[a]n interpretation which gives effect to both provisions is the preferred interpretation." *State v. Murphy*, 35 Wn. App. 658, 664, 669 P.2d 891 (1983), *review denied*, 100 Wn.2d 1034 (1984).

■ CR 56(c) allows the filing of declarations, since the rule states that any "supporting affidavits, memoranda of law, or other documentation" may be filed with the summary judgment motion. Additionally, a party need not file supporting affidavits in order to move for or oppose summary judgment under CR 56, and nowhere does the rule prohibit the filing of declarations. The use of declarations in lieu of affidavits is appropriate in summary judgment proceedings.

## MUTUAL MISTAKE

Scott contends that a basic assumption of the contract was that he could fill his property subject only to restrictions imposed by the zoning code of the City of Algona and that the property was suitable for his intended use. Scott argues that there was a mutual mistake as to this basic assumption because neither party was aware of the applicability of federal wetland regulations and COE's jurisdiction.

■■ Equity may allow avoidance of a contract when all parties independently make a clear, bona fide mistake. *PUD 1 v. WPPSS*, 104 Wn.2d 353, 362, 705 P.2d 1195, 713 P.2d 1109 (1985). The mistake must be as to a "basic assumption" of the contract, which means that the mistake must vitally affect the basis upon which the parties contract. *PUD 1*, at 362. In addition, a party seeking to avoid the contract must not have borne the risk of mistake. *PUD 1*, at 362. A party bears the risk of the mistake when the risk is allocated to him by the contract. Restatement (Second) of Contracts § 154(a) (1981). A party also bears the risk of the mistake when, at the time the contract is made, the party is aware of limited knowledge with respect to the facts to which the mistake relates but treats such limited knowledge as sufficient. *PUD 1*, at 362. It is said in such a

situation that there is no mistake; instead, there is an awareness of uncertainty or a conscious ignorance of the future. *PUD 1*, at 362.

Petett argues that a mutual mistake cannot be based upon a mistake as to the applicable law. However, the Restatement (Second) of Contracts has discarded the distinction between mistakes of fact and mistakes of law. *See* Restatement (Second) of Contracts § 151 comment *b*, at 384 (1981). The Restatement rule "treat[s] the law in existence at the time of the making of the contract as part of the total state of facts at that time." Restatement (Second) of Contracts § 151 comment *b*, *supra*. It is not entirely clear that this rule has been adopted in Washington. However, in *Chemical Bank v. WPPSS*, 102 Wn.2d 874, 899, 691 P.2d 524, *cert. denied*, 471 U.S. 1065 (1984), our Supreme Court permitted rescission of a contract on the basis of a mutual mistake of law where at the time the contract was entered into, it was assumed that municipalities and PUD's had statutory authority to enter into the agreements involved. Holding to the contrary is *Goldfarb v. Dietz*, 8 Wn. App. 464, 469, 506 P.2d 1322 (1973). Because of the *Chemical Bank* case, we proceed on the assumption that a mutual mistake of law can be grounds for rescission of a contract.

There is no mutual mistake in this case, however, because all risks involving zoning and "the physical and practical feasibility of using the subject real property for industrial development" were allocated to Scott by the contingency clause in the purchase and sale agreement.

The contingency clause gave Scott, in his sole discretion, the right to withdraw from the transaction if the deadline of September 27, 1987, was reached and he was not satisfied with the feasibility of using the property for his intended use of industrial development.

The clear allocation of this risk to Scott defeats, as a matter of law, his claim of mutual mistake.

A second reason Scott cannot prevail on his claim of mutual mistake is that on September 18, 1987, when 9 days remained on the contingency period and the rezone process

had not been completed, Scott elected to close the transaction. The sale was closed on October 1, 1987.

This decision by Scott brought him squarely within the doctrine which places the risk of the mistake on the party who proceeds to contract with limited knowledge with respect to the facts involving the alleged mistake. As stated in *PUD 1*, at 362:

> It is said in such a situation that there is no mistake; instead, there is an awareness of uncertainty, a conscious ignorance of the future.

Scott argues, however, that these rules should not apply to him because of Harris' "promise" to accomplish the zoning and Scott's reliance upon that promise.

While an issue may arguably exist as to just how Harris' undertaking was phrased, it is not material here because of the election by Scott to abandon his efforts to obtain a rezone by the City of Algona and his failure to apply to COE for a permit.

Scott argues that Harris was negligent in not learning earlier of COE's jurisdiction and passing this information on to Scott. However, even under Scott's version of Harris' undertaking, it was limited to obtaining a rezone from Algona. There is no basis in the record for expanding Harris' undertaking to doing enough research and investigation to discover COE's involvement prior to Scott's election to proceed to closing on October 1, 1987. This means Harris had no duty to Scott to conduct the kind of investigation Scott now claims he should have made.

It follows that the fact Harris voluntarily undertook to aid Scott in obtaining the rezone from Algona did not have the legal effect of creating a mutual mistake in the circumstances of this case. Scott's claim of mutual mistake must fail.

Scott contends that the law should not impose upon him the requirement of proceeding with a rezone application and seeking a permit from COE, where such actions would be futile. He bases his claim of futility upon conversations he had with knowledgeable persons who expressed the

opinion that his efforts to obtain a permit from COE would not be successful.

In the context of exhaustion of administrative remedies, the question of futility is one of law for the court. *Estate of Friedman v. Pierce Cy.*, 112 Wn.2d 68, 75, 768 P.2d 462 (1989). "Generally speaking, if a plat application, application for a conditional use permit or variance, or other administrative procedure could result in a decision resulting in beneficial use of the land, factual futility should not be found." *Estate of Friedman*, at 80-81. In this case, the showing made by Scott in his attempt to establish futility falls far short of establishing futility as a matter of law.

## FRUSTRATION OF PURPOSE

Scott contends that Petett is barred from any recovery on the promissory note and from foreclosure of the deed of trust under the doctrine of frustration of purpose.

Petett and Northwest contend that the doctrine of frustration of purpose is inapplicable when one of the parties to a contract has been allocated the risk of impracticality or frustration. In the case of *Weyerhaeuser Real Estate Co. v. Stoneway Concrete, Inc.*, 96 Wn.2d 558, 637 P.2d 647 (1981), our Supreme Court recognized the rule that the doctrine of frustration does not apply if the contract between the parties disclosed an allocation of that risk to one party or the other.

The contingency clause gave Scott 90 days in which to make a determination as to the physical and practical feasibility of using the subject real property for industrial development. Scott's claim of commercial frustration is based upon difficulties which developed in respect to obtaining the necessary permits for industrial development of the property. This is precisely the risk that was the subject of the contingency clause. The trial court correctly ruled as a matter of law that the purchase and sale agreement allocated that risk to Scott. Accordingly, he has no claim of frustration of purpose.

■ Even had the risk not been allocated to Scott, he has not demonstrated that his purpose in contracting is impracticable or frustrated. Scott never applied for either a rezone or a permit to fill the property. Until those possible administrative remedies are pursued to a logical conclusion without success, frustration of purpose has not been established. *See Stevedoring Servs. of Am., Inc. v. Marvin Furniture Mfg., Inc.*, 54 Wn. App. 424, 433, 774 P.2d 44 (1989) (holding that for purposes of doctrine of commercial frustration, a contracting party's principal purpose has not been frustrated if that party fails to attempt to remedy the problem through available administrative or legal procedures).

### CLAIM OF MISREPRESENTATION

Scott contends that Petett and Northwest misrepresented the property's suitability for his intended use. This contention is not supported by the record. Both parties were fully aware of the necessity for rezoning and that a substantial fill was contemplated. All problems in getting the necessary permits for industrial development of the property were clearly allocated to Scott. It is clear that any statements by Harris regarding suitability were subject to the knowledge on the part of everyone of the required fill and that the property had to be rezoned.

At the meeting of the parties on September 18, with full knowledge that rezoning had not been accomplished, Scott agreed to waive the contingencies and proceed with the purchase. There is no basis upon which Scott can rationally argue that any statements by Harris influenced his decision to waive the contingency clause at that critical juncture. His claim of misrepresentation must be rejected.

### CONSUMER PROTECTION ACT

Scott contends that a Consumer Protection Act (CPA) violation occurred because Northwest, through its agent Harris, (1) misrepresented the property's suitability for industrial use without sufficient inquiry, (2) failed to fulfill its fiduciary duties regarding Harris' promise to obtain the

property's rezoning during the contingency period, (3) was negligent in the completion of the SEPA checklist, (4) failed to properly inquire as to the involvement of government agencies other than Algona in the filling of the property, (5) violated the real estate brokers and salespersons act, RCW 18.85, and (6) engaged in the unauthorized practice of law by preparing the agreement and other documents related to closing.

In order to sustain an action under the CPA, RCW 19.86, a private party must show (1) an unfair or deceptive act or practice; (2) in trade or commerce; (3) affecting the public interest; (4) injury to plaintiff in his or her business or property; and (5) a causal link between the unfair or deceptive practice and the injury suffered. *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 784-85, 719 P.2d 531 (1986). Scott has failed to make a threshold showing with respect to elements (1), (3), and (4). As demonstrated by previous discussion in this opinion, an unfair or deceptive act or practice has not been established. Furthermore, this is a single private transaction, where the principal dispute is between a buyer and seller of real estate. The role of Northwest is tangential, at best. As previously discussed in this opinion, Scott's injury arises out of a risk which he contracted to accept. It follows that he has not demonstrated an injury for purposes of the CPA, and his CPA claim was properly dismissed.

As for Scott's claim of unauthorized practice of law by Harris, it is conceded that this argument was not raised at trial. It, therefore, will not be considered for the first time on appeal.

Judgment affirmed.

FORREST and BAKER, JJ., concur.